STATE v. COSTNER.

(December 4, 1900.)

1. *Evidence—Identity of Defendant—Competency—Scintilla—Burglary—Criminal Law.*

Where there is more than a scintilla of evidence as to the identity of the defendant, it is for the jury to pass upon its weight.

2. *Argument of Counsel—Solicitor—Abuse of Privilege—Trial—Criminal Law—Comment of Counsel.*

An attorney for the prosecution may comment before the jury on the failure of the defendant to examine a witness subpœnaed by him.

3. *Argument of Counsel—Comment of Counsel—Abuse of Privilege—Trial—Criminal Law—Alibi.*

A solicitor may comment on the failure of defendant to prove his whereabouts at the time of the commission of the offense.

4. *Evidence—Weight—Sufficiency—Jury—Criminal Law—Burglary.*

Where there is evidence, though it is not strong, it is for the jury to pass upon its weight.

FAIRCLOTH, C. J., dissenting.

INDICTMENT against Wade Costner, heard by Judge *Frederick Moore* and a jury, at August Term, 1900, of CATAWBA Superior Court.

The defendant pleaded "not guilty," and the State introduced the following witnesses: Miss Claudia Sluman, who testified: "I live near Catawba, at the home of Miss Sue Abernethy. Was living there July 6. On the night of July 6, between twelve and one o'clock, I awoke suddenly. Just

as I started to get out of bed I touched some one on floor by side of bed whom I supposed to be my aunt. My aunt, my sister and I were in the room. Room was down stairs. I called my aunt and she answered. The person got up from side of bed and got into window and went out. Man was small of stature, without coat or hat. It was my conviction that the man was black. I knew defendant's figure but not his face. He is small of stature."

Question. "What is your opinion from what you saw of the man that night as to who it was?"

(Objection by defendant. Objection overruled. Defendant excepts.)

Answer. "The figure in the room that night compared more favorably with Wade Costner than anyone else I could think of in that community."

(Defendant's first exception.)

"Defendant worked in an adjoining field and I would see him often when the crops were worked. Sometimes would see him twenty-five times a day, and some times would not see him during day. Do not know where he lives. Field in which he worked was just across the road from my home. Windows were three feet and ten inches from the ground. The three windows in the room were raised; they were entirely open. The night was bright. The east and south windows are not protected by shade."

*Cross-Examination.*

"Do not know that I ever saw defendant until planting time this year, but have seen him often this year. Never paid any attention to defendant's face, and was not familiar with it. Field where defendant worked was just across the street from my home. It is about seven feet from bed to north or east window at which person went out. Nothing

was disturbed in the room. I had not been awake very long, and awoke rather suddenly and decided to lower the windows. Do not remember at what time I retired that evening. My aunt was sleeping on the opposite side of the room. She did not reply the first time I called. Then I called my sister, and then my aunt again, and she answered, though she was in an unconscious condition. The person then arose, walked to window, got up in window and went out. I did not see the person's face. I said before the Justice of the Peace (at preliminary trial) that I would not be willing to swear whether the person was white or black. I would not swear now that the man was black. I do not consider the defendant's appearance peculiar. Defendant is a negro. I never claimed that I could swear· that the defendant is the person who entered the house. I had never seen the defendant at the house."

Miss Jennie Sluman, who testified: "Am sister of last witness and live at same place. I was awake. My sister called my aunt, then called me, and then called my aunt again, and began to scream. Figure was small of stature; sprang up and walked to window. I had side view. He was a negro of medium color, small of stature. I had seen defendant pass frequently and at work in the field. Figure and color correspond more with the defendant than anyone I know of about· home. Have seen defendant frequently. There are three windows in the room, and the shades were to top of window, and the curtains were pulled back, and we had advantage of all light. The person walked to the window, put his right foot up, then his left, and then got out. He did not have on hat or coat, and made no noise when he got into the window. We screamed, and my uncle came down from up stairs. I do not know which direction the person went off."

*Cross-Examined.*

"I do not know what awoke me. I was awake a little while before my sister called my aunt. Until my sister sprang and screamed I did not know that anything was wrong. Was excited. Expected death. Did not swear before Justice of the Peace that I had seen defendant working in field frequently. Did say that I had seen him frequently or often. Will swear that defendant's figure and color resemble Mr. Lawrance's hand (laborer). Do not know his face. Found nothing disturbed in the room. There was nothing in front of window at which defendant went out. It is seven feet from foot of bed. The bed stood out a little from wall, and I was on back side of bed. Window was at end of room, in front of foot of bed. Figure rather directly to window. I remained in the bed until figure went out. Do not remember that I went to door or window after the person left. Do not know whether or not moon was shining. Stars were. The night was clear. There were no trees at end of house. My uncle fired a pistol several times and called, and Mr. Lawrence answered. Think the person put his left foot on the window sill. Can not swear where he had his hands. Do not claim to have identified the man who was in the room."

John Lawrence, who testified: "Live near Catawba. Heard report of gun or pistol. Live one-quarter or one-third of mile from Sluman's. Heard Sluman call, and told me to come. Went to house, fifty yards from house I live in. Roseman, Abernethy and Costner (defendant) stayed there. Roseman and Abernethy were there. They talked to me. Do not think I called the defendant. Did not see nor hear defendant there. This was ten minutes before one o'clock. Saw defendant next morning at barn, between daybreak and daylight. Asked him where he was the night before, and he

said that he was at 'Uncle Eat's.' Eat. Lawrence lived about as far from Sluman as I did."

*Cross-Examined.*

"Defendant worked for me Friday, and ate supper at my house. Family ate supper about dark and the negroes afterwards. Do not know what time he left my house. Defendant worked until dinner Saturday. Told him that morning that he need not work longer than till dinner unless he wanted to. He worked for me last summer and began again the first of March and worked till this trouble occurred. Defendant's general character has been good since he has been at my house. He came to me well recommended."

Eaton Lawrence, who testified: "I live near Sluman's. Know defendant. Know night when somebody went into the house where Mr. Sluman lives. Defendant came to my house about an hour and a half before day, and said he was tired, and wanted to stay the balance of the night at my house. He seemed tired and worried. He does not usually stay at my house."

*Cross-Examined.*

"I went to bed early that night. Got awake about midnight and did not go to sleep any more that night. Did not hear shooting and disturbance. Did not sleep any more after defendant came. John Lawrence about same direction from Sluman's that I live, and not quite so far. Brad Edwards was at my house. He works for me. He was asleep. Defendant slept with Edwards that night. He went to sleep as soon as he got in the bed and slept until I waked him up to go home. Brad Edwards did not get awake that night, and did not leave the house. I did not tell anybody that defendant came there before twelve o'clock. The same day de-

fendant was arrested I told about him coming to my house about an hour and a half before day. John Lawrence lives about the same direction from Sluman's that I live and not quite as far."

*Re-Direct.*

"Edwards was at my house all night. He slept in bed with me. He went to bed about dark and got up about sun up next morning. Defendant slept in bed with Edwards and me."

State rested, and the defendant offered no evidence.

From a verdict of guilty and judgment thereon, the defendant appealed.

*R. D. Douglas,* Attorney-General, for the State.
No counsel for defendant.

MONTGOMERY, J. The defendant, whose character was said to be good, by his employer on the trial, was convicted of burglary in the second degree at the August Term, 1900, of the Superior Court of Catawba County. The case, as we read it from the evidence, presents some peculiar phases. It appears from the evidence that the defendant was found lying or crouching on the floor, near the side of the bed in which one of the witnesses was sleeping, between 12 and 1 o'clock at night. There were three grown persons sleeping in the same room at the time. The windows were up. It is difficult to believe that the purpose of the defendant was to do any harm to the occupants of the room, and, from the evidence, nothing was disturbed. The evidence as to the identity of the defendant, while more than a scintilla, was little more than shadowy. The two witnesses for the State who were occupants of the room did not claim to know the face of the defendant, and one of them did not know that the in-

STATE *v.* COSTNER.

truder was white or black, and both witnesses closed the testimony by saying, one, "I never claimed that I could swear that the defendant is the person who entered the house;" and the other, "I do not claim to have identified the man who was in the room." There was evidence, however, concerning the defendant's whereabouts on the night of the occurrence, which to some extent compromised the defendant, and which probably had undue weight with the jury; but with that we can have no concern.

The first exception of the defendant was to the receiving by his Honor of certain evidence testified to by one of the occupants of the room. She had said that the man who entered the room was small of stature, without coat or hat, and that she knew defendant's figure, but not his face. She was asked by the Solicitor, "What is your opinion, from what you saw of the man that night, as to who it was?" She answered, "The figure in the room that night compared more favorably with Wade Costner than anyone else I could think of in that community." That evidence was weaker than that which was allowed in the case of *State v. Lyttle,* 117 N. C., 799, to prove the identity of Lyttle. There the witness said, in substance, that it was so dark he could not tell whether the man whom he saw in the road was white or black; that he had his back to him; that he had known him 10 years; that he was a low, chunky man; and that, if he had spoken to him, he would have called him Lyttle. But the evidence in the present case was more than a scintilla, and for that reason it has to be received.

The exception made by defendant's counsel to the refusal of his Honor to instruct the jury that, upon all the evidence, they should return a verdict of not guilty, can not be sustained. The evidence was not strong against the defendant, but there was evidence against him, and it was for the jury to pass upon its weight.

STATE *v.* COSTNER.

The defendant had subpœnaed, as a witness for himself, Brad Edwards, who was present at the trial. One of the attorneys who was assisting the Solicitor commented before the jury on the failure of the defendant to examine this witness. His Honor refused to interfere, and the defendant excepted. The exception is without merit. The point is settled in *State v. Jones,* 77 N. C., 520, and *State v. Kiger,* 115 N. C., 746. The Solicitor commented upon the fact that defendant had able counsel, and had not brought a witness to show or explain where he spent that night, and the defendant's counsel asked his Honor to stop the Solicitor in his remarks, which request was refused. The comments of the Solicitor were not out of place; for evidence had been introduced for the State tending to show that about the hour of the occurrence, or a little later, the defendant went to the house of one of the State's witnesses, and there spent the balance of the night—a thing which was most unusual with him—and that he was not at his own house that night. It is further testified to by one of the State's witnesses that on the next morning the defendant was asked by his employer where he had spent the night, and the defendant said, "At Uncle Eat's." The fact was, if Eaton Lawrence's (Uncle Eat's) testimony was true, the defendant spent only an hour or an hour and a half at his house, and that the defendant seemed tired and worried. *State v. Johnson,* 88 N. C., 623, is, in principle, in point on this exception.

No error.

FAIRCLOTH, C. J., dissents.