Defendant was indicted for obtaining money by false pretense, in that he represented to one Dr. David J. Fuller "that the stock of the Hendersonville Traction Company could be bought for $20,000, and no less," and that "he, the said C. A. Carlson, had $10,000, and that if the said David J. Fuller would furnish the other $10,000, he, said C. A. Carlson, would purchase all of the said stock in said Hendersonville Traction Company, and that they would hold it jointly and unencumbered," which it is alleged in the indictment was false, and which defendant knew to be false, as "he did not have $10,000, or any sum, to use in the purchase of said Hendersonville Traction Company, and that the said C. A. Carlson had at the time of making the representation (820) an option on all of the capital stock of the Hendersonville Traction Company for the sum of $15,000, as he, the said C. A. Carlson, then and there knew." It is further alleged that by the color and means of the said false pretense he unlawfully, designedly, and feloniously obtained from David J. Fuller the said amount of $10,000 with intent to cheat and defraud him.
Mrs. David J. Fuller, witness for the State, testified: "I live in Hendersonville; I have lived here for six years. I lived in Brooklyn, N.Y., before coming here. My husband's name was David J. Fuller. He is dead; died on the 18th of last August; his business was that of a retired dentist. He died at the age of 76. I know C. A. Carlson. I met him first in the fall of 1912 at the Kentucky Home Hotel in Hendersonville. Dr. Fuller and a woman that Carlson introduced as his wife were present. This was during the very last days of October, or the early part of November, 1912, I met Mr. Carlson the next day at my own home. Prior to the issuing of the check spoken of here, Carlson was in our home every day, and sometimes twice a day. In regard to the charge that Carlson obtained a check from my husband for $10,000, there was quite a little led up to the signing of the $10,000 check. In the early days of November Mr. Carlson came frequently to our home, and in the living-room of our home one evening, before my husband and myself, he said, addressing my husband by his given name: `David, we can get this Hendersonville Traction Company for $20,000; we can go into it together and own all the stock jointly. I have my $10,000 ready, if you can get the same amount.' There had been a discussion between the two men prior to this, but this was the first time I heard of it in the presence of both of them. Doctor said to Carlson that he thought he could get his $10,000. Carlson asked him, `How soon?' and Dr. Fuller said, `Well, I will have to look into my bank account. I always keep several thousand on hand, but I have not that much in the bank, but *Page 902 
can borrow from the bank, as I have frequently done in the past.' At another time, probably the next day, Carlson came into the house and said that he had been talking to Mr. U. G. Staton and Mr. D. S. Pace further about buying the Traction, and that they were very warm about the subject, and Dr. Fuller said, `Cannot you get them down to $18,000?' Whereupon Mr. Carlson said, `No; I have tried that, but it won't do. They won't take less than $20,000.' `Another thing,' said Mr. Carlson, `there is a man in town who wants that Traction; he comes from Brooklyn, and he will beat us to it if we don't get it.' `How soon do you think you will get that $10,000 that you will put in with me?' Dr. Fuller said, `There is no trouble about my share in the Traction; you can go ahead and do what you can about the deal.' Things went along like that till 15 November, when Mr. Carlson, coming into the (821) house one day, after talking about things, he said: `I want to go over and bind that Traction deal with Mr. Pace and Mr. Staton, but I am short of cash. I have no money here. I am expecting letters from New York with money. Can you lend me $50 with which to bind the Traction? I will pay it right back to you.' Dr. Fuller said, `Yes; I will write you a check.' About the middle of November he asked the doctor for $50 with which to bind the Traction deal, and Dr. Fuller was about to write the check, and Mr. Carlson said, `No, don't write a check; that will bring you right into it, and they will suspect that you are having something to do with it.'
"Back to the first meeting. I asked Dr. Fuller, in the presence of Carlson, if they had consulted a lawyer about this. I know all about such affairs. I have had lots of experience. Lawyers eat up a great deal of money.' And Dr. Fuller said, `Yes, I know they do.' So it was agreed that no lawyer should be brought into the matter; that Mr. Carlson would fix all these things and matters to the satisfaction of Dr. Fuller. When in the middle of November Carlson asked Dr. Fuller for the $50, and Dr. Fuller was about to write the check, the doctor turned to me and asked if I had the money by me. Doctor said he never kept such a large sum on his person. I said I didn't think I had that much. And Mr. Carlson said, `Why can't you make out the check to yourself, David, and cash it yourself?' Doctor sat deliberating and said, `Yes, that might do.' I said, `Birdie,' meaning Mr. Barber, `is outside and has his wheel, and he can go over to the first bank and cash the check, after you write it, and bring it right back. He would be quicker than you.' After a few minutes Mr. Carlson agreed to it, and I went out and told Barber. Barber came in the house, and Dr. Fuller wrote the check for $50, payable to H. J. Barber. Mr. Barber went over to the bank and got the money, and brought it back, and handed it in my presence and Mr. *Page 903 
Carlson's presence to Dr. Fuller, and Dr. Fuller counted the $50 to Mr. Carlson, and said, `There, Charles, is the purchase money for the Traction.' Dr. Fuller said, `Wait a minute, Charles; I'll go with you; wait till I get my coat and hat.' Mr. Carlson said, `No, don't do that; we want to keep this matter a secret. We don't want them to know anything about it for a few weeks.' Then Dr. Fuller said, `Yes, I remember; that is all right.' Mr. Carlson said, `I'll go over and bind the Traction, and tell you about it.' Mr. Carlson went out that morning and came back in the afternoon, and said he had paid over the $50 to bind the Traction. From 15 November up to the first days of December Mr. Carlson was at the house frequently, and spoke of the Traction to Dr. Fuller, in my presence. Dr. Fuller said, `It is a fine thing to have this right, free and clear.' Carlson said, `Yes, a great thing to own all the stock together. And what a wonderful thing that we met on the train as we did. What a fine thing that Mrs. Carlson asked you (822) to come to her.' Things went on like that until 1 December, or thereabouts, when Mr. Carlson came to the house one day and said, `David, I don't want to be inquisitive about your private affairs and bank account, but if you cannot get that $10,000 that you will put in with me to buy the Traction Company by the first of January, I must know about it.' Dr. Fuller said, `I can get it by the first of January.' Carlson said, `I don't want to be inquisitive, as I said, but I would like to know just how you are going to make it.' Dr. Fuller said, `I am not a rich man; my general income is derived from the home I have in Brooklyn, New York, and shares in the American Beet Sugar.' `Do you own that outright?' asked Carlson. `Yes, I own it outright,' replied the doctor. `Oh, man alive!' Mr. Carlson said, `don't you know that beet sugar is going to be the first thing taxed?' Carlson said, `There are already rumors that they will tax this beet sugar. You have been asleep at the switch.' And then he came and put his arm around his shoulders, and said, `Doctor, you have been losing four or five hundred dollars a day by holding that stock. Where is the morning paper?' Carlson then picked up the paper from the table and pointed to the beet sugar stock, and said, `See, it is now 91. It was 102 last week. It has been dropping down. You want to sell that now, or you won't have anything left at all.' Dr. Fuller sat there deliberating, and finally said, `I have held that stock since its infancy. I bought it over thirty years ago. It has never failed to pay its dividend. It is paying its dividend now. I don't think I had better sell it.' Mr. Carlson insisted that the stock should be sold. Finally, at Mr. Carlson's request, Dr. Fuller went to the telephone and dictated a telegram, which was sent to his broker in New York, telling him to sell all his holdings, and those I had with him jointly, at 91. Carlson was present. The stock was sold in a day or two for nearly *Page 904 
$27,000 and deposited in Brooklyn bank in the name of Dr. Fuller and myself. On 4 December Dr. Fuller wrote a check for $10,000. I was in the library with him when he wrote the check. I cannot remember that Carlson was present. The check was written payable to Charles A. Carleson for the sum of $10,000. This is the check. (The State here introduced in evidence the check.) The check was drawn 9 December, but was dated ahead. I cannot say positively, but very likely it was dated prior to the 9th, as Dr. Fuller dated his checks ahead. (Check is marked Exhibit A.) The check is indorsed in Carlson's handwriting twice, the first `Charles A. Carlson' and the second is `Charles A. Carlson.' It is spelled in the face of the check, `Charles A. Carleson.'
"It was one year, December, 1913, before I found that this Traction road didn't cost $20,000. I saw Carlson in a few days afterward. I found him in his office in New York City. I went to New York the day after I learned the Traction hadn't cost $20,000. I was (823) determined to find out what had become of the rest of the money. I went to Mr. Carlson's office, but he was not there. I waited for him, and when he came into his office he was very much taken back to see me, and asked me what I was doing in New York. It was two or three days before Christmas, 1913. I had brought my little daughter to New York with me. I said, `What would I be doing in New York? I am here doing a little Christmas shopping.' Then he interrupted me. `How is David?' he said. I said, `Want to see you about that; doctor is not well.' He expressed his sorrow. I said, `He is grieved, and I myself have called to know why things are at such a standstill with the Traction Company — where the money has gone. We want a friendly accounting.' Mr. Carlson said immediately, `That can all be attended to, Mrs. Fuller; all the files are in the possession of C. S. Calvert in Hendersonville. If there is anything out of the way, we will get these files from Calvert. In fact,' he said, `I will send for them. I have sent for them to come up here. But I will send a telegram, not to send them, but keep them till you return.' `Well,' I said, `we can easily account for the first $10,000. The road cost $20,000. You put in $10,000 and doctor $10,000. Is that not so?' `Yes,' he said; `the road cost $20,000. I put in $10,000 and doctor put in $10,000.' I said, `Mr. Carlson, I know to the contrary. I have learned from very good information in Hendersonville that the road only cost $7,500 in cash, with the assumption of a mortgage of $7,500. Where is the rest of the money?' He began to mutter and halt and clear his throat, and to tell me that he had a very bad cold. `Well.' I said, `where is the original contract between you, purchasing the Traction Company, with Staton and Pace?' He said, `That paper is with all the records of the Traction together. You *Page 905 
can have them any time you like. I will let you look at them.' I said, `I would like to see that paper.' I never saw it. I never have seen it."
The defendant, at the proper time, moved to nonsuit the State, which motion was overruled. There was a verdict of guilty. Defendant then moved in arrest of judgment, which motion also was refused. He took exceptions to both rulings. Judgment, and appeal by defendant.
Defendant contended in this Court that there was a variance between the allegations and the proof.
After stating the case: The motion to nonsuit requires that we should ascertain merely whether there is any evidence to sustain the allegations of the indictment. The same rule applies as in civil cases, and the evidence must receive the most favorable construction in favor of the State for the purpose of determining its legal (824) sufficiency to convict, leaving its weight to be passed upon by the jury. S. v. Carmon, 145 N.C. 481; S. v. Walker, 149 N.C. 527; S. v.Costner, 127 N.C. 566. The effect of Laws 1913, ch. 73, allowing a motion for nonsuit in a criminal case, was considered in S. v. Moore, 166 N.C. 371;S. v. Gibson, 169 N.C. 318. Where the question is whether there is evidence sufficient to warrant a verdict, this Court considers only the testimony favorable to the State, if there is any, discarding that of the prisoner. S. v. Hart, 116 N.C. 976. The weight of the evidence and the credibility of the witnesses are matters for the jury to pass upon. S. v.Utley, 126 N.C. 997. Applying these familiar principles to the case under consideration, we are constrained to hold that the conviction of the defendant is sustained by the evidence.
A criminal false pretense may be defined to be the false representation of a subsisting fact, whether by oral or written words or conduct, which is calculated to deceive, intended to deceive, and which does in fact deceive, and by means of which one person obtains value from another without compensation. S. v. Phifer, 65 N.C. 321; S. v. Whedbee, 152 N.C. 770. In order to convict one of this crime the State must satisfy the jury beyond a reasonable doubt (1) that the representation was made as alleged; (2) that property or something of value was obtained by reason of the representation; (3) that the representation was false; (4) that it was made with intent to defraud; (5) that it actually did deceive and defraud the person to whom it was made. S. v. Whedbee, supra. There is proof in this case of every element of the crime. Mrs. Fuller's testimony, if true, is of itself sufficient to justify a verdict *Page 906 
of guilty. The representation was that defendant could buy the stock of the railway traction company for $20,000, but for no less. Dr. Fuller did not wish to invest so much in it, his share being one-half, or $10,000, and he asked Carlson if he could not get it for $18,000, to which the latter's reply was, "No; I have tried that, but it won't do. They won't take less than $20,000. Another thing, there is a man in town who wants that Traction; he comes from Brooklyn, and he will beat us to it if we don't get it. How soon do you think you will get that $10,000 that you will put in with me?" Dr. Fuller replied, "There is no trouble about my share in the Traction; you can go ahead and do what you can about the deal." This representation as to price of the stock was false to the knowledge of Carlson. He had already bought it, or taken an option to buy it, for $15,000. At first the owners of the stock, U. G. Staton and Dr. D. S. Pace, offered to sell to him at $17,000, and Carlson then offered $12,000, the parties finally agreeing on $15,000 as the price. Carlson, apparently impecunious, went to see Dr. Fuller and even borrowed from him the $50 with which to make the deposit required "to bind the bargain." There was evidence that he was acting stealthily (825) and with the purpose of concealing the fact that he was negotiating for the purchase for Dr. Fuller, as well as himself. After urging Dr. Fuller, then 73 years old, to pay his part of the purchase money, he finally got him to do so, receiving his check for the $10,000, of which he paid $7,500 to the owners of the stock, kept $2,500 for himself, and left a note and mortgage for $7,500 standing on the property. He never paid any part of his share of $10,000. Without regard to the other evidence of a damaging character, what we have just recited would seem to be a sufficient answer to the motion for a nonsuit. We have proof of the representation of a subsisting and material fact, viz., that he could buy the stock at not less than $20,000, and the falsity of it; that the representation was made with intent to deceive and defraud Dr. Fuller of his money, and that it actually did deceive and defraud him. There can be no question that there is ample evidence to show the false representation, and that it was calculated and intended to deceive Dr. Fuller, and did deceive him, appears when we consider the testimony of Mrs. Fuller that her husband knew nothing as to what had passed between Carlson and the owners of the stock, and was ignorant of the fact that Carlson had actually purchased the stock, under the option, for $5,000 less than he had represented the price to be; that Dr. Fuller wanted to buy it for less than $20,000, and Carlson told him that it could not be done, and that finally Carlson obtained the $50 in cash, and afterwards the check for $10,000. Was he deceived by the representation? Mrs. Fuller testified: "Dr. Fuller said, `Charles, this is a great thing, that we are getting this Traction together. It will be a great *Page 907 
thing to own this stock with you — just the two of us.' And Mr. Carlson said, `Yes, and we don't want to let this matter get out in town.' I said, `For what reason, Mr. Carlson?' He said, `Why, don't you know that if Dr. Fuller was thought to be in the transaction, they would think I was "putting one over them"?' This was the first time I had ever heard the expression. He said, `It is all right after a few weeks. We can mention that the doctor is in it; but just at present we won't say anything about it at all." And then he asked me to be very careful about what I said. And he told me later not to let anything get out."
Carlson did not like the idea of the doctor giving him his check for the $50, but insisted that the check should be made payable to some one else who could have it cashed. The jury might well have inferred from all this secrecy and a suppression of the facts, and especially of the connection of Dr. Fuller with the transaction, that Carlson feared, if it became known that Dr. Fuller was his copartner, he might find out what had been paid for the property, and the efforts of Carlson to cheat and defraud him might be foiled. That Dr. Fuller was actually deceived and that Carlson obtained the money or the check by reason of the deception, clearly appears from the evidence favorable to the State.
It would be useless to dwell long upon the phases of the (826) evidence which tend to establish several elements of the crime and the guilt of the accused, nor is it necessary that we should point out any conflict in the evidence, because we are not permitted to decide as to its weight. To do so would invade the province of the jury. The evidence is quite as strong as in some cases where convictions of crimes have been sustained by this Court. S. v. Carmon, 145 N.C. 481; S. v. Walker,supra, and cases cited. We refer especially to S. v. Matthews, 121 N.C. 604, which was an indictment for cheating by false pretense. This is the syllabus in that case:
"1. If a person by his acts or conduct induces another to believe that a fact is really in existence, when it is not, and thereby obtains money or property, he comes within the scope of the statutes against false pretenses.
"2. Where on the trial of an indictment for obtaining money under false pretenses there was evidence that the defendant obtaining money from the deceased husband of the witness to get an Electropoise, which defendant, claiming to be an agent therefor, had agreed to sell to the husband, and which defendant claimed to be in the express office, when there was, in fact, no Electropoise in such office, and that the defendant kept the money so obtained: Held, that the evidence was sufficient to be submitted to the jury."
The conduct of defendant when Mrs. Fuller met him in New York at his office, and their conversation, were circumstances which the jury could consider in addition to evidence already commented upon. *Page 908 
There was no substantial variance, if variance at all, between the allegations of the indictment and the proof. There must, of course, beallegata and probata, and they must correspond. The State cannot by indictment charge a defendant with the commission of one offense and convict him upon proof of another offense. S. v. Gibson, 169 N.C. 318. But that is not what has been done in this case. The charge is that defendant represented that they could not buy the stock, not the stock and something else, at less than $20,000, which was knowingly false, in that he had already contracted to buy it at less than that amount. There was evidence to sustain this charge. U. G. Staton testified: "Dr. D. S. Pace and I owned stock in the Hendersonville Traction Company, and sold the same to C. A. Carlson about the first of November, 1912, and Carlson was to pay us $7,500 in cash when we made the stock over tohim." Mrs. Fuller testified that in a conversation between Carlson and Dr. Fuller, Carlson said, "David, we can get this Hendersonville Traction Company for $20,000 — we can go into it together and own all thestock jointly." Defendant, in his testimony, also referred to the transaction as one for the purchase of the stock of the Traction Company. His language was: "I said Staton would sell the stock for (827) $20,000." There is plenary evidences that all the representations were false, as we have shown and as appears from the testimony of Mrs. Fuller. It cannot be successfully contended that there is no evidence that defendant was deceived by the false representation and was thereby induced to part with his money, and that he was greatly impoverished by the conduct of the defendant, not being able to attend his brother's funeral because of the lack of money with which to pay his expenses. This is mentioned to show how easily he became prey of the defendant's duplicity and deceit, if the evidence of Mrs. Fuller is believed. There is much of this evidence that he contradicted, but the jury has settled the conflict of evidence against him.
The motion in arrest of judgment was properly overruled.
The indictment is drawn according to approved precedents. It alleges that the defendant did falsely pretend:
1. That the stock of the Hendersonville Traction Company, a corporation, could be purchased for $20,000, and no less.
2. That he, the said C. A. Carlson, had $10,000, and that if the said David J. Fuller would furnish the other $10,000, he, C. A. Carlson, would purchase all of the stock in the Hendersonville Traction Company and that they would hold it jointly, and unencumbered.
And these representations are thus negatived:
1. That the stock of said Traction Company was not held at $20,000, but that he, the said Carlson, had at the time of making said *Page 909 
representation an option on all of said capital stock of said Hendersonville Traction Company for the sum of $15,000.
2. That he did not have $10,000, or any sum, to use in the purchase of stock in said Hendersonville Traction Company.
It is true that the indictment should negative by special averment the truth of the pretense alleged, 19 Cyc., 426; but there is such an averment in this bill, and the allegation of the representation and its falsity is sufficient, even within the principle stated in the cases cited by the defendant. S. v. Pickett, 78 N.C. 458; S. v. Lambeth, 80 N.C. 393; S.v. McWhirter, 141 N.C. 809, and in Rex v. Perrott, 2 Maule Selwyn, 379.
Every indictment must be certain to a general intent. It must state all the facts and circumstances which constitute the offense with such certainty and precision that the defendant may be enabled to see whether they constitute an indictable offense. The object of an indictment is to inform the prisoner with what he is charged, as well to enable him to make his defense as to protect him from another prosecution for the same criminal act. It should, therefore, be reasonably specific and certain in all its material averments, S. v. Hill, 79 N.C. 656; S. v. Lambeth,supra. Within this rule, the particulars of the representation and its falsity are plainly stated, so that the defendant must have been (828) apprised of the nature of the crime with which he was charged.
There are some matters called to our attention which are irrelevant to the question involved. The stock without the plant or assets of the company would be valueless, as the former is issued and based upon the latter, and the parties must have supposed that when they were buying stock they were to become the real owners of the company's property to the extent that there was no exception from the transfer. But that is immaterial, as the only question is whether defendant made the representation as to the stock knowing it to be false, and did he thereby deceive Dr. Fuller and obtain his money. This issue was raised by the indictment and the plea, and there was evidence to sustain the verdict. S. v. Matthews, 121 N.C. 604.
There is no error in the record, and it will be certified accordingly.
No error.
Cited: S. v. Wilson, 176 N.C. 753 (1c); S. v. Phillips, 178 N.C. 714
(1cc); S. v. Rountree, 181 N.C. 538 (1c); S. v. Jenkins, 182 N.C. 819 (1c);S. v. Crouse, 182 N.C. 836 (1c); S. v. Martin, 182 N.C. 849 (1c); S. v.Whisnant, 185 N.C. 611 (1c); S. v. Williams, 185 N.C. 664 (1c); S. v.Potter, 185 N.C. 743 (1c); S. v. Judd, 188 N.C. 831 (1c); S. v. Roberts,189 N.C. 95 (2c); S. v. Rideout, 189 N.C. 160 (1c); S. v. Sigmon,190 N.C. 687 (1c); S. v. Ballangee, 191 N.C. 701 (5c); S. v. *Page 910 Montague, 195 N.C. 22 (1j); S. v. Johnson, 195 N.C. 507 (2cc); S. v. King,196 N.C. 51 (1c); S. v. Carr, 196 N.C. 133 (1c); S. v. Mayer, 196 N.C. 456
(2c); S. v. Lawrence, 196 N.C. 564 (1c); S. v. McKinnon, 197 N.C. 582 (1c);S. v. McLeod, 198 N.C. 653 (1c); S. v. Casey, 201 N.C. 203 (1c); S. v. Lea,203 N.C. 30 (1c); S. v. Ammons, 204 N.C. 757 (1c); S. v. Satterfield,207 N.C. 121 (1c); S. v. Anderson, 208 N.C. 782 (1c); S. v. Landin,209 N.C. 22 (1c); S. v. Eubanks, 209 N.C. 763 (1c); S. v. Coal Co.,210 N.C. 746 (1c); S. v. Smoak, 213 N.C. 90 (1c); S. v. Hammonds,216 N.C. 75 (1c); S. v. Brown, 218 N.C. 420 (1c); S. v. Mann,219 N.C. 214 (1c); S. v. Howley, 220 N.C. 117 (2c); S. v. Johnson,220 N.C. 775 (1c); S. v. Law, 227 N.C. 104 (5c); S. v. Davenport,227 N.C. 495 (2c).