STATE OF NORTH CAROLINA v. WAYNE DARNELL BUMPERS.

(Filed 20 June, 1967.)

1. **Jury § 3—**

   The court correctly permits the solicitor to ask prospective jurors whether they have scruples against capital punishment and in the event they express such scruples the court correctly excuses them for cause, since the State, as well as defendant, is entitled to impartial jurors.

**2. Searches and Seizures § 1;   Criminal Law § 79—**

The search with the free assent of the owner of a house in which defendant lived, as established by the owner's testimony, and the seizure of a gun belonging to the owner of the house from a part of the house not assigned to defendant, *held* not to require a search warrant, and the gun was properly admitted in evidence upon ballistics identification of it as the one used in the commission of the offenses, and defendant's motion to suppress the evidence was properly denied.

**3. Searches and Seizures § 1—**

Defendant, against whom incriminating evidence is procured by the search of premises with the consent of the owner, has no ground for complaint, since no constitutional right can be violated by a search with the consent of the owner of the premises. Constitutional guarantees must be applied with a view of protecting the public against criminals as well as protecting the innocent who are unjustly accused.

**4. Criminal Law §§ 97; 110—**

If the solicitor was guilty, in this case, of commenting in his argument upon defendant's failure to testify, such impropriety was cured by the court's explicit instruction that defendant's failure to testify created no presumption against him whatsoever, that there was no requirement that defendant testify, but that the State was required to prove defendant's guilt beyond a reasonable doubt.

APPEAL by defendant from *Hobgood, J.,* 24 October 1966 Criminal Session, ALAMANCE Superior Court.

The defendant Wayne Darnell Bumpers was charged in a bill of indictment with the rape of one Loretta Briggs Nelson on 31 July 1966. In another bill he was charged with a felonious assault upon her with a .22 caliber rifle, and in a third bill with a felonious assault upon Monty Jones. The three cases were consolidated for trial and were tried at the October 1966 Criminal Session.

The State offered evidence through the testimony of Loretta Nelson, twenty-one years of age, and who is separated from her husband, which is summarized herein. She said that on the night of 31 July 1966, she went for a ride in her 1965 Corvair with Monty Jones, whom she had been dating for some time. They parked on a secluded road and had been there for about ten minutes when the defendant Wayne Bumpers came up to the car and tapped on the window. She rolled the window down about two inches, and he asked her to open the door. Upon her refusal, he put a rifle in the window and told her to get out of the car. When she did, he demanded her favors, which she refused. Bumpers then pointed the gun at Monty Jones, and said "Are you going to give it to me?" She then consented, and he said, "Well, strip." She took her clothes off, laid on the back of the car, and the defendant raped her. He had made Monty get in the back seat and kept the rifle in his hand pointed towards Monty's

head. The defendant hit Loretta in the head with a gun, causing it to bleed. She testified that he had intercourse with her. She put her clothes back on, and the defendant then made the couple walk down the road. He followed about fifteen feet behind them with his gun. He ordered them to get in the car, with Loretta in the driver's seat, the defendant sitting beside her, and Monty on the back seat. He held a gun on Monty and told Loretta that if she tried to run off the road he would shoot Monty. They came to a little road, and the defendant made them stop the car, get out, and walk down to some bushes. He made them lie down on the ground and told them to stick their hands up in the air. Loretta begged him to let them go, to which Bumpers replied, "I can't do it; you will go to the cops." He said he was going to kill them. Monty then told Bumpers to tie them to a tree, that he didn't have to kill them. At Monty's suggestion, the defendant made Loretta tie Monty to a tree with her belt with his hands behind him, blindfolding and gagging him. The defendant then tied Loretta to a tree, after which he raped her again, having taken off her shorts and pants. After this, the defendant asked Monty where his heart was and then stepped back and shot him. He reloaded the gun and shot Loretta through the left breast, the bullet going all the way through her. The defendant left in Loretta's car. She got her hands free and untied Monty. They walked up the road to a farm house (McPherson's), called for help, and told Mr. McPherson that a negro boy had shot them. McPherson called the Sheriff's Department and an ambulance, which took them to Alamance County Hospital.

Loretta said that from the time they first saw the defendant until they got loose was about an hour and a half. "During that time I had an opportunity to hear him talk. I got an opportunity to look at his face, when he opened the car door. The light in the car come on. It was a full moon out there that night otherwise; we could see pretty clear." She identified the defendant as her assailant, said she had never seen him before July 31, but "I know I saw him on July 31. In my own mind I am certain, and nothing could really dissuade me from it."

The testimony of Loretta's companion, Monty Jones, was similar to hers in that he described the events just as she did. He said, also, that he was shot in the middle of the chest, and the bullet lodged in his back. It was taken out three days later. Monty was taken to Alamance Hospital and later transferred to Memorial Hospital in Chapel Hill where he stayed for two weeks. He testified that the doctor sewed up both sides of his stomach, took out his spleen and did something to his lip. He said "I saw the man who assaulted me

on July 31 in the courtroom. (Witness indicates the defendant.) I am indicating the defendant Wayne Darnell Bumpers . . . I seen my attacker in the car. I knew what he looked like. I seen him in the car. I only knew what he looked like."

The State offered evidence to corroborate the testimony of these two witnesses relating to what they had told them and also as to the identification of the defendant as the assailant.

Dr. William M. Crutchfield testified that he was an intern at Memorial Hospital in Chapel Hill, that he treated Monty Jones and described the latter's injury, that Dr. Hartzog performed an exploratory operation with Dr. Crutchfield assisting. He said "The missile track indeed went through the anterior or front portion of the diaphragm, went through the left side of the liver, through the lower part of the stomach and lacerated or injured the spleen . . . and you could feel the bullet underneath the skin on the left side of the chest . . . the spleen had to be removed because it was bleeding . . . the bullet was not removed at this time for many reasons, one being the area had a lot of air in the skin . . . Six days after he was admitted to the hospital, . . . we put this (anesthetic) in the skin, made a very small incision, and the bullet popped right out." He testified that the next day he gave the bullet to Mr. Minter, agent of the S.B.I.

J. M. Minter testified that he is a member of the State Bureau of Investigation, that he went to the place which was described as the scene in question where he found a .22 cartridge. He also saw some dress material, or cotton, one piece tied three or four feet above the ground with some parts lying on the ground and some strands of thread from which cloth had been removed. He testified that on August 2 he went to the home of Mrs. Hattie Leath, grandmother of the defendant who lived with her, where he found a .22 caliber, single-shot rifle which was taken to the S.B.I. laboratory in Raleigh and turned over to Agent John Boyd. He identified a .22 caliber bullet that he received from Dr. William Crutchfield at Chapel Hill, and it was also taken to the S.B.I. laboratory in Raleigh and given to Agent John Boyd who further identified a .22 spent cartridge which was found at the scene of the shooting in the area where the cloth was tied on the tree. This was also taken to Raleigh and turned over to Agent John Boyd.

John Boyd testified that he has been employed with the State Bureau of Investigation for fifteen years and is the Special Agent in charge of the Firearms Section of the Crime Laboratory. His specialty is firearms identification and ballistics work. The Court held that he was an expert in that field. He identified the cartridge

case and the two bullets received from Mr. Minter as having been fired from the rifle which had previously been identified as being the one found in the home of Mrs. Hattie Leath.

Dr. Allen D. Tate, Jr., whom the Court held to be a medical expert, testified that he made a pelvic examination of Loretta Nelson on the evening of July 31, made a slide, which showed the presence of sperm. He said he was not able to tell how long it had been there but gave it as his opinion that she had engaged in sexual intercourse within the past twenty-four hours prior to the time he saw her. He said she had a contusion and a laceration of her forehead, which was bleeding slightly and required three stitches.

The defendant moved for judgment as of nonsuit at the close of the plaintiff's evidence, which was denied. The defendant offered no evidence and again moved for judgment of nonsuit, which was denied.

The jury returned verdicts of guilty as charged in the bills of indictment (for felonious assault) and a verdict of guilty of rape with the recommendation of life imprisonment. The Court thereupon pronounced sentences of ten years imprisonment, to run consecutively, in each of the felonious assault cases, and that he "be imprisoned in the State Prison for the remainder of his natural life, to be assigned to work as by law provided," which was to begin at the expiration of the two ten-year sentences in the felonious assault cases.

From the judgments, the defendant appealed.

*Smith, Moore, Smith, Schell & Hunter by Norman B. Smith, Attorneys for the defendant. Of Counsel: Lee, High, Taylor & Dansby by Herman L. Taylor.*

*T. W. Bruton, Attorney General; Harry W. McGalliard, Deputy Attorney General, for the State.*

PLESS, J. The defendant makes a very interesting argument in his brief to the effect that it was error for the Court to excuse prospective jurors on the ground that such persons did not believe in capital punishment. He recognizes that this position has been adversely determined in the very recent case of *State v. Childs*, 269 N.C. 307, 152 S.E. 2d 453, but requests that the Court reconsider and reverse the ruling therein made. However, this decision was adopted by a unanimous Court within the past few weeks, and the reasoning of it is sound and convincing. The following excerpts, some of which are quotations from other courts, are well chosen and concisely stated in the opinion of Chief Justice Parker:

"It is a general rule that the State in the trial of crimes punishable by death has the right to an impartial jury, and in order to secure it, has the right to challenge for cause any prospective juror who is shown to entertain beliefs regarding capital punishment which would be calculated to prevent him from joining in any verdict carrying the death penalty.

" '. . . What (the defendant) is really asserting is the right to have on the jury some who may be prejudiced in his favor — *i. e.*, some who are opposed to one possible penalty with which he is faced. We think he has no such constitutional right. His right is to absolute impartiality.'

" 'It will readily be seen that this "balanced" jury, which the defendant envisages, is in reality a "partisan jury"; if, as he urges, it may include jurors with bias or scruples against capital punishment it must — if it is to have "balance" — include also those with bias in favor of the death penalty as the punishment for murder. It is settled that under the Statute the verdict must be unanimous both as to guilt and as to punishment. As a result, . . . any juror "can hang the jury if he cannot have his way" as to the sentence which he deems appropriate. These considerations lead to the conclusion that trials before "balanced juries," even on unanimous findings of guilt, would frequently result in disagreements. And disagreements on successive trials would result in practical immunity from murder. We cannot believe that the Statute was intended to have such a tendency.'

" 'Upon the theory that conscientious scruples against infliction of the death penalty under any circumstances, or equivalent beliefs, equally disqualify a jury for cause in a prosecution for a capital crime, whether the law prescribes the single punishment of death upon conviction, or invests the jury, upon conviction, with a discretionary power to assess death or life imprisonment according to the evidence and circumstances, the rule has become generally accepted that where the jury is vested with such discretion the state may challenge for such cause because it is entitled to the maximum penalty if the proof shall justify it, and to contend throughout the trial and finally to the jury that the character of the crime justifies it.' "

Fifty-three prospective jurors were examined, sixteen of whom stated that they were opposed to capital punishment, and they were thereupon excused from service. If the argument of the defendant is to be carried to extremes, it would mean that if the State had exhausted its peremptory challenges when these sixteen jurors were examined that the entire jury would have been opposed to capital

punishment. It is well-known that in many horrible cases the defendants are anxious to avoid the possibility of a death sentence and will offer, and in fact plead for permission, to enter a plea of guilty which will mean the imposition of a life sentence. However, the Solicitor in many of these cases feels that the public interest requires that a jury, rather than he, should take the responsibility of saving the defendant from the death penalty, if it is to be done, and therefore puts the defendant on trial in which the death penalty is sought.

Every litigant, whether it be the State or the defendant, in a criminal case or the parties in a civil case, is entitled to an impartial jury. Where a juror states in advance that under no circumstances would he accept the contentions and positions of a party, he is not impartial to that party but, as a corollary, must necessarily be partial to the adversary.

If a prospective juror stated that under no conditions would he acquit a defendant or that no evidence could cause him to convict the defendant, it should not be claimed that he was an impartial juror. In a case in which the prosecution was relying exclusively upon circumstantial evidence, no court would require the State to accept a juror who stated that under no conditions would he convict a defendant upon circumstantial evidence. Where a venireman states that he has read or heard so much about a case that he had formed the opinion that the defendant was guilty, and he would not under any conditions acquit him, no court would permit such person to serve on the jury; and we can conceive of no reasonable person who would argue that he should. This, however, is merely the corollary of the defendant's position in this case.

The result in this case refutes the argument of the defendant. A jury wholly composed of persons who believe in capital punishment have still not imposed it upon the defendant in a case where the facts overwhelmingly would sustain the death penalty.

The defendant complains of the search of his grandmother's house which resulted in finding a rifle that has been identified as the one which fired the shots into the bodies of Mrs. Nelson and Monty Jones. But it must be remembered (1) that his premises were not searched — they were his grandmother's; (2) *his* rifle was not taken — it was his grandmother's; (3) *she* gave permission for the search and has not yet complained of it. Since the Solicitor announced that he was not relying upon the search warrant but upon permission given by the owner of the premises for its search, the question arises as to whether her consent was voluntarily given. While there are decisions that the presence of officers and the announcement that

they wish to search premises constitutes a condition in which coercion and intimidation may be present, they are not applicable here.

The defendant sought an order of the Court requiring the State to return the rifle and to suppress evidence regarding it. In support of the motion they offered the affidavit of Mrs. Hattie Leath in which she said: "On Tuesday, August 2, 1966, at about 2:00 P.M., four white men drove up to her house in two cars. She knew these men to be officers of the Alamance County Sheriff's Department, although they were not in uniform . . . One of the deputies came up on the porch of her house and walked up to the front screened door. She was standing immediately inside the door. The deputy said he had a notice or a warrant or something like that, for searching her house. He did not appear to have any paper in his hand, and he did not read anything to her. After hearing this, she did not stop to think about whether the officers had a right to search her house. She simply answered the officer right away by saying, 'Go ahead,' as she opened the door and stepped out onto the porch. The officers began at once to search the house."

During the trial the State offered the rifle which was found in the house, and upon objection to its admission, the Court excused the jury, and Mrs. Leath testified in person. Some of her statements are quoted as follows (the underscoring is ours): "I own my own house; it belongs to me . . . The defendant Wayne Darnell Bumpers was living with me on that date' . . . He has been living with me at this place all of his life . . . Sheriff Stockard came out to my home . . . Four of them came. I was busy about my work, and they walked up and said, 'I have a search warrant to search your house,' and I walked out and *told them to come on in.* . . . I just told him to come on in and go ahead and search, and I went on about my work. I wasn't concerned what he was about. I was just satisfied . . . I told Mr. Stockard to go ahead and look all over the house. I had no objection to them making a search of my house. I was willing to let them look in any room or drawer in my house they wanted to. Nobody threatened me with anything . . . I let them search, and it was *all my own free will.* Nobody forced me at all." She also said, "I did have a .22-caliber Remington, single-shot rifle at my house on July 31. Most of the time it stayed inside the wardrobe and then behind the door, out from the living room. This is my rifle . . . I have owned it since my husband bought it."

It is to be noted that the rifle was not found in the defendant's private room, nor in any part of the house assigned to him, but "inside the wardrobe, or behind the door."

Following Mrs. Leath's testimony, the following entry was made by the Court:

> "THE COURT: The Court finds that from the evidence of Mrs. Hattie Leath that it is of a clear and convincing nature that she, the said Mrs. Hattie Leath, voluntarily consented to the search of her premises, as is more particularly set forth in her evidence, and that that consent was specifically given and is not the result of coercion from the officers. MOTION DENIED for suppression of the evidence with references to the .22-caliber rifle, marked State's Exhibit No. 2."

We know no better way to establish that one's actions were voluntary than by the statement and attitude of the person concerned. No interpretation can be placed upon Mrs. Leath's testimony that would sustain any claim of coercion or pressure or intimidation. The defendant cites *Mapp v. Ohio*, 367 U.S. 643 (1961), and we have also had called to our attention the very recent case of *Maryland Penitentiary v. Hayden*, decided by the U. S. Supreme Court 29 May 1967. Upon consideration of them, we find them inapplicable here. Rather, the terse statement of Denny, J., later C.J., speaking for the Court in *State v. Moore*, 240 N.C. 749, 83 S.E. 2d 912, is controlling:

> "The first question posed is whether a search warrant was required to search the premises of the defendant if he consented to the search. The answer is no. It is generally held that the owner or occupant of premises, or the one in charge thereof, may consent to a search of such premises and such consent will render competent evidence thus obtained. Consent to the search dispenses with the necessity of a search warrant altogether. . . . The second question is whether the defendant consented for the officers to search his premises . . . The Court found as a fact that the defendant, at the request of the officers, voluntarily gave them permission to search his premises . . . the ruling of a trial judge on a *voir dire*, as to the competency or incompetency of evidence [adduced upon the search], will not be disturbed if supported by any competent evidence."

It cannot be successfully argued that when the owner of premises voluntarily gives consent for search that all of the other occupants of the house are required to agree. "One cannot complain of an illegal search and seizure of premises or property which he does not own . . . and one may not object to an illegal or unreasonable search of the property of another, if his own privacy is not unlawfully invaded." 79 C.J.S. 811, *et seq.* Had the rifle-user concealed

the weapon under a stack of hay in a neighbor's barn, his permission need not be granted before the barn could be searched.

In *Commonwealth v. Tucker,* 189 Mass. 459, 76 N.E. 127, the officers searched the home where the defendant resided after his mother had invited them to make any search they desired. They found evidence that incriminated the defendant. He contended that the articles taken in the search were not admissible against him. The Court said, "It is argued that the defendant did not consent and that his mother could not consent for him. But that is immaterial. The officers did not act under the warrant but under the invitation of the mother."

The object of government is to protect the rights of the public — the people. Otherwise, there is no reason for it — and the individual would have to protect his home, his possessions, and his family. In protecting the public, we must always remember that innocent persons may be unjustly accused, and their rights, too, must be safeguarded. But we must not become too zealous in protecting the accused that we overlook and ignore those who have been robbed, raped and murdered.

The United States and North Carolina Constitutions wisely and properly inhibit unreasonable and unwarranted searches. These provisions are not intended to shield the criminal — they are to protect the innocent citizen in his privacy, and to make every man's home his castle. They should not give to a criminal an impenetrable fortress in which he can barricade himself against all proof of guilt.

Here, a young woman is twice raped, and then she and her companion are told that they must die, lest they reveal the identity of the rapist and murderer. One bullet from his cruel rifle penetrates the entire body of one. The other is lodged near the heart of the other. Is it unreasonable and unwarranted that the officers, charged with the duty of apprehending the heartless and inhuman perpetrator, should use every energy in locating the weapon used, and apprehending its user? An overwhelming majority of the public would immediately answer that *any* means would be justified. But the officers, recognizing the restraints under which they must work (some might call them unreasonable and unrealistic), make a search of the premises in which they have ample evidence that the accused lived — and do so with the voluntary permission of the person who owns and controls them. Their search might reveal nothing, and to some extent absolve the suspect. The fact that it did reveal the presence of the guilty weapon, to which the already identified assailant had access, justifies the search. Recurring to the fundamental that the object is not to protect criminals and to provide them with the right

to perpetrate such a horrible crime without fear of apprehension, it is clear that his rights have not been violated. Rather, his wrongs have been detected.

For the reasons above stated, we are of the opinion that the evidence with regard to the rifle was competent, and the exceptions relating thereto are overruled.

The defendant also excepts to the following argument alleged to have been made by the Solicitor in his address to the jury: "The State has tried to bring in all the evidence. If there are some questions you want answered, it is not the State's fault that they have not been answered." However, no objection was made at the time, and it is thus waived. *State v. Costner*, 127 N.C. 566, 37 S.E. 326; *State v. Jenks*, 184 N.C. 660, 113 S.E. 783; *State v. Bryant*, 236 N.C. 745, 73 S.E. 2d 791; *State v. Lewis*, 93 N.C. 581; *State v. Steele*, 190 N.C. 506, 130 S.E. 308.

The record is not explicit, but apparently, following the argument of the Solicitor, the defendant made an exception to parts of it at which time the Court made the following entry:

"THE COURT: The defendant objected to the State implying that the defendant did not testify or go upon the stand or present evidence. The Court will instruct the jury as to that phase of the law, and the Court does not recall any reference that the Solicitor made to the defendant's failure to testify, and the Court was present, sitting on the Bench during the entire argument of the Solicitor."

The Court fulfilled the above, and fully protected the defendant's rights (*State v. Lewis*, 256 N.C. 430, 124 S.E. 2d 115) when he charged the jury as follows:

"Now, members of the jury, in this case the defendant has not testified in his own defense, neither has he offered any evidence in his own defense in any of the three cases for which he stands for trial. The Court instructs you that the defendant may or may not testify in his own behalf as he may see fit and his failure to testify shall not create any presumption against him whatsoever. Therefore, the Court further instructs you with reference to the same that there is no requirement upon the defendant to testify, there is no requirement that he give evidence in the case because the requirement is that the State proves the defendant guilty beyond a reasonable doubt as the Court has defined that term of any of the charges against him or any lesser degrees of those charges.

"Therefore, please bear in mind the instructions that the defendant's failure to testify shall not create any presumption

against him whatsoever and certainly no presumption of guilt."

There can be no doubt that an atrocious crime was committed upon the young lady here involved and that her assailant intended to take two lives to avoid identification. There can be little doubt of the good faith of Loretta Nelson in identifying the defendant. It is only human nature that she would insist that the guilty person, and not someone else, be punished. That is also true of her companion. The evidence of these two alone would be amply sufficient to sustain the verdict of the jury and the judgment of the Court. The evidence that the rifle found in the home where the defendant lived was the one that fired the shots into the bodies of the State's witnesses merely "makes assurance doubly sure" that the defendant is guilty. We hold that his rights have been fully protected, and that in his trial there was

No error.