## STATE v. WILL DAVIS.

### (Filed 9 April, 1919.)

**1. Murder — Evidence — Highway Robbery—Mob—Unlawful Purpose—Res Gestae.**

Where there is evidence that the prisoner, on trial for murder, was in a crowd at night organized for the purpose of committing highway robbery, and that after the mob had held up an automobile in which the deceased was riding, the prisoner deliberately and premeditatedly shot and killed him without provocation, it is unnecessary to show that the prisoner himself had joined in with the cry of the mob, "Let's stop him," in order to make such exclamations competent on the trial, such being indicative of the unlawful purpose of the crowd with which he was acting, tending to show the *quo animo* of their actions and being a part of the *res gestæ*.

**2. Same—Intermediate—Declarations—Continuous Transactions.**

Where there is evidence tending to show that the deceased was a member of a crowd assembled for the unlawful purpose of committing highway robbery at night, and that after the mob had held up a passenger in an automobile the prisoner deliberately and premeditatedly shot and killed him with a pistol, without provocation, it is not necessary to show that the prisoner was personally present at an intermediate time and had joined in with the cry halting the deceased, as such is within the *res gestæ*, being a part of the whole transaction of a connected and continuous nature from beginning to end.

**3. Courts — Superior Courts — Adjournments—Order of Judge—Sheriffs—Statutes—Validity of Trials.—Murder.**

Where the term of office of a Superior Court judge expires two days after the commencement of a term of court which his predecessor would

otherwise have held, it is proper for the retiring judge not to appear, and for his successor to notify the sheriff of the county to adjourn the court from day to day for four days until he could qualify, though the sheriff may himself thus exercise the authority given him by statute; and objection to the validity of a trial for murder on that gruond is untenable. *S. v. Wood,* 175 N. C., 809; *S. v. Hardin, infra.,* and *S. v. Simmerson, infra.,* cited and approved.

ACTION tried before *Bryson, J.,* and a jury at the December Term, 1918, of FORSYTH.

The prisoner was indicted for the murder of Charles White.

. In order to understand the questions presented to this Court, it will be necessary only to state a portion of the testimony of Jacob Jackson, a witness for the State, and the assignments of errors, as follows:

Jacob Jackson testified: "On 17 November, 1918, in the evening, I was standing on Depot Street, in front of Cook's Cafe, and a crowd of about fifty or seventy-five people came by, defendant Will Davis being in the crowd, and they made me come with them on down Fifth Street, and just after crossing the railroad they held up one car, and the man in the car said he was a doctor and the crowd let him go on by. They went on down to Fifth and Linden streets and another car came down the hill, and they stopped it; three men went to the middle of the street and stopped the car. Will Davis was one of the three. One of the fellows had on a big overcoat and the other one was a soldier boy named 'Red,' that being all I know of his name. I do not know the man who had on the big overcoat nor do I know who was in front when they stopped the doctor's car, but after stopping that car the crowd went about as far as from me to the end of the courthouse, until they stopped the car that the man was shot in. The car in which the man was shot was coming towards town and down the hill, and the lights on the car were burning. They saw the car coming over the hill and said, 'Let's stop him.' (The prisoner objected to what was said, unless prisoner said it. Objection overruled; exception by prisoner.) They waited until the car got very near to them and then Will Davis, the man with the big overcoat on, and the soldier named 'Red' stepped out in the street in front of the car and stopped it. There were two men in the car. Mr. White was at the steering wheel. They made the other man get out of the car until they searched the car and got what they wanted out of it, and then made the man get back in the car. Mr. White said, 'I am the electric light man, let me by.' Some of the boys said 'Let him by,' and others said 'Don't let him by,' and about that time a pistol fired, and the man in the car hollered that he was shot. After these three men got in front of the car and stopped it, Will Davis went on the south side of the car, which was the same side Mr. White was sitting

STATE *v.* DAVIS.

on, the man that was shot, and Will Davis put his gun right through the ribs or arms of the top of the car—the top being up—right at White's side, and the shot was fired, and as the car drove away all of them—I reckon all of them that had pistols—commenced shooting at the car. I have been knowing Will Davis for about a year. I never saw defendant Jim Scales in the crowd that night as I know of; I didn't know him. Immediately after Mr. White was shot the crowd went on up the street and held up another man, but I do not know who the man was; the distance from where they held up Mr. White to where they held up the other man was about as far as from witness stand to back end of courthouse. Then the crowd went on towards Jordan's store and stopped on the corner of Fifth Street and Highland Avenue, right under the light."

Under the evidence and the charge of the court, to which there was no exception, the jury convicted the prisoner, Will Davis, of murder in the first degree. He was sentenced to death and appealed from the judgment, assigning the following errors.

"1. The court erred in overruling the prisoner's objection and allowing the witness, Jacob Jackson, to testify that some one in the crowd, seeing a car approaching, said, 'Let's stop him,' as shown by the prisoner's first exception.

"2. There was error in overruling the prisoner's objection and allowing the witness, Jeff H. Jackson, to testify that some one in the crowd of colored people said 'We'll get him,' as shown by the prisoner's second exception.

"3. There was error in allowing the witness, John C. Ayers, to testify in regard to an assault made upon him by Jim Scales, over the objection of the prisoner, when there was no evidence that this defendant had anything to do with the assault on Ayers or that he was in the crowd at that time, as shown by the prisoner's third exception.

"4. There was error in allowing the witness, Ed. Gordon, to testify, over the prisoner's objection, that a crowd was coming up Fifth Street and they said 'Halt,' as there was no evidence that this defendant was in the crowd at that time, as shown by prisoner's fourth exception."

By consent of the solicitor, a verdict of not guilty was returned as to James Scales.

*Attorney-General Manning and Assistant Attorney-General Nash for the State.*

*No counsel for defendant.*

WALKER, J., after stating the case: There was plenary evidence to show that the prisoner shot the deceased, inflicting a mortal wound

from which he died. The charge of the court upon all the different phases of the case was exhaustive and correct in every particular, and there is no exception to it. We will proceed, therefore, to consider the questions of evidence.

1. There is a slight error of fact in this assignment of error, as the witness Jacob Jackson stated, not that "some one in the crowd said 'Let's hold him,' but that 'they,' meaning, of course, the crowd, said so. But, assuming that he had referred to only some one in the crowd, the evidence was competent, and what we say here covers the second assignment of error." For the purpose of showing the admissibility of this evidence we may well refer to *Saunders v. Gilbert,* 156 N. C., 463, at pages 470 and 471. In that case it appeared that many persons had gathered in the street and followed the plaintiff to his home, where they stopped in front of his house, some or all of them using abusive and threatening language. The question arose in the trial below, whether these outcries of this mob or unlawful assembly were competent against each and every one of the crowd. With regard to this, we said: "The testimony as to what was said in the road and in front of the plaintiff's home was clearly competent. The *res gestæ* includes what was said as well as what was done. The acts and the outcries of this unlawful assembly—for that is, in plain speech and in law, what it was—is held to be competent as *pars rei gestæ,* and also as tending to show their purpose or *quo animo.* Nothing is better settled than this rule of evidence. *S. v. Rawls,* 65 N. C., 334; *S. v. Worthington,* 64 N. C., 594. We find it stated in 4 Elliott on Evidence, sec. 3128, that 'What is said and done by persons during the time they are engaged in a riot (or unlawful assembly) constitutes the *res gestæ,* and it is, of course, competent, as a rule, to prove all that is said and done'—the acts and words of the mob or any members of it, as in *Rex v. Gordon,* 21 State Trials, 485 (563), wherein evidence of the cries of the mob 'No Popery,' as it was proceeding towards Parliament House, were held competent and admissible as a part of the *res gestæ.*" This would seem to be a full answer to these objections. The same rule of evidence had been before stated and applied by us in *Henderson-Snyder Co. v. Polk,* 149 N. C., 104, 107. We there held that where two prisoners are engaged together in the execution of a common design to defraud others, the declarations of each relating to the enterprise and in furtherance of it, are evidence against the other, though made in the latter's absence, if a common design has been shown, citing *Lincoln v. Chaplin,* 7 Wallace (U. S.), 132. It is, perhaps, the universal rule that any act done, or any declaration made, by any one of the conspirators in the furtherance or perpetration of the alleged conspiracy may be given in evidence against himself or his co-conspirators. This rule has been more aptly stated as

STATE *v.* DAVIS.

follows: "The law undoubtedly is, that where two or more persons combine or associate together for the prosecution of some fraudulent or illegal purpose, any act or declaration made by one of them in furtherance of the common object, and forming a part of the *res gestæ,* may be given in evidence against the other." The principle on which the declarations of other conspirators, and acts done at different times, are admitted in evidence against the persons prosecuted is that, by the act of conspiring together, the conspirators have jointly assumed to themselves as a body the attribute of individuality, so far as regards the prosecution of the common design, thus rendering whatever is done or said by one, in furtherance of that design, a part of the *res gestæ,* and therefore the act of all. Substantially the same rule applies in criminal as in civil cases as to the admissibility of the acts or declarations of one conspirator as original evidence against each member of the conspiracy. 4 Elliott on Evidence, sec. 2939, citing *Card v. State,* 109 Ind., 415; *Cuyler v. McCarthey,* 40 N. Y., 221; *S. v. George,* 29 N. C., 327; *Cabiness v. Martin,* 15 N. C., at p. 110. See, also, Lockhart on Evidence, sec. 210; *Blair v. Brown,* 116 N. C., 631. This doctrine as to the competency of the cry or exclamation of a mob, or any one of the mob, while it is in the prosecution of its illegal design or purpose, has been of long standing, and was certainly established in the proceedings against Lord George Gordon for high treason, when such evidence was freely admitted by *Lord Mansfield* and his associates on the King's Bench, *Justices Willes, Ashurst* and *Buller,* who presided at the hearing of that celebrated case (21 St. Trials, 486), for the same riot, so graphically described by Charles Dickens in his Barnaby Rudge.

2. As to the third and fourth assignments, we must hold that there was evidence that the prisoner was with the rioters when the assault was committed on John C. Ayers, and also when they were marching on Fifth Street and crying "Halt." These events were but a part of one whole transaction, which was continuous in its nature and essence from beginning to end, and what was said or done by the mob or any of its members was competent to show its unlawful character and motives. It was held, in a case resembling this one in its principal features, that acts and circumstances forming a continuation of the main transaction are admissible as *pars res gestæ. Floyd v. State,* 143 Ga., 286. The several events occurring, one after the other, in close and connected succession, must be viewed as linked together for one purpose, which was a bad one as tending to a breach of the public peace and to strike terror into the travelers on the highway, who had the right to go their way without molestation or being made afraid. It had for its purpose even more than that evil design, it aimed actually not only to terrify but to commit highway robbery, or murder if need

37—177

STATE *v.* DAVIS.

be, in order to gratify its fiendish and wanton desire. It was regardless of every duty it owed to society, and fatally bent on mischief. While in the execution of their illegal and high-handed purpose, to hold that any outcry from this band of marauders is not admissible as evidence against each one of them would violate a rule of the law too well established, founded as it is upon a just and adequate reason, to be set at naught where it applies so aptly. Dr. Wharton, in his excellent treatise on Evidence, has said: "If in one of our streets there is an unexpected collision between two men, entire strangers to each other, then the *res gestæ* of the collision are confined within the few moments that it occupies. When again there is a social feud in which two religious factions, as in the case of the Lord George Gordon disturbances or of the Philadelphia riots of 1844, are arrayed against each other for weeks, and so much absorbed in the collision as to be conscious of little else, then all that such parties do and say under such circumstances is as much part of the *res gestæ* as the blows given in homicides for which particular prosecutions may be brought." 1 Wharton on Evidence, sec. 258; *R. R. v. Herrick,* 49 Ohio St., 25; *Small v. Williams,* 87 Ga., 681; *Linck v. Vorhauer,* 104 Mo. App., 368.

2 Jones on Ev., sec. 347, states that in such cases the declarations have been received on the ground that they were but parts of a *continuous act,* which showed the intention of the person or persons whose motives were in question, and as explanatory of the act. The rule in this respect is well stated in *Mutual Life Ins. Co. v. Hillman,* 145 U. S., 285: "Wherever the bodily or mental feelings of an individual are material to be proved, the usual expressions of such feelings are original and competent evidence. Those expressions are the natural reflexes of what it might be impossible to show by other testimony. If there be such other testimony, this may be necessary to set the facts thus developed in their true light, and to give them their proper effect. As independent, explanatory or corroborative evidence, it is often indispensable to the due administration of justice. Such declarations are regarded as verbal acts, and are as competent as any other testimony, when relevant to the issue. Their truth or falsity is an inquiry for the jury." And it is also said that from whatever point of view a given circumstance is regarded in connection with its admissibility as one of the *res gestæ,* it is absolutely essential that the claim shall be founded on its being one of the immediate family of facts which relevantly constitute the real subject matter. Does it belong to it, or has it only a distant relation and relevancy. If it is not part, then the admissibility, if at all, must be based on ground other than that of *res gestæ.* Although, as we have seen, different tribunals do not agree as to the degree of strictness or liberality with which they apply the rule that the declaration should

STATE *v.* DAVIS.

be contemporaneous with the transaction in issue, there is no doubt but that the declaration must be a *part of such transaction,* and that it must illustrate or explain it. The declarations must be calculated to unfold the nature and quality of the facts which they are intended to explain; they must so harmonize with those facts as to form one transaction, of which they are considered a part; they must be concomitant with the principal act, and so connected with it as to be regarded as the result and consequence of coexisting motives. These declarations, especially when in the form of instantaneous or contemporaneous outcries or exclamations, are admitted as evidence upon the idea that they are natural and spontaneous utterances, which are prompted by no intention to suppress or conceal the truth, the declarant having no opportunity for deliberation or the fabrication of evidence. This kind of proof is not only very persuasive, but nearly always very convincing in its probative force.

In any view we can fairly take of this case and the court's ruling, we find that the trial was entirely free from errors, and that the prisoner's rights have been fully protected. The charge of the court was a remarkably clear, accurate and forceful one.

The question whether Judge Bryson had lawful authority to preside over the court in which the prisoner was tried and convicted, has been fully considered and decided against the prisoner's contention at this term in *S. v. Harden and Beale, post,* 580, and *S. v. Simmerson, ante,* 545, and no further discussion would seem to be necessary. It may be well to state, though, that Judge Lane acted properly and discreetly in abstaining from attendance at the court, as there were only two days for him to preside (30 and 31 December), because Judge Bryson's term commenced on the third day, 1 January, 1919, when he duly qualified and was ready to proceed with the business of the court. Judge Bryson acted properly in notifying the sheriff to adjourn the court from day to day for four days, until he could qualify and appear to hold the court, although the sheriff had the power, under the statute, to do this without any notice. *S. v. Wood,* 175 N. C., 809. That case decides the principal question involved here as to the power of Judge Bryson, as there it was held:

"1. The provision that the sheriff should adjourn the court from day to day until the fourth day of the term, and then for the term, in the absence of the judge who was to have held it, under the law, is subject to the provision that this shall be done 'unless the sheriff shall be sooner informed that the judge, from any cause cannot hold the term,' which implies the power of the judge to order an adjournment to a later day in the term. Rev., sec. 1510.

"2. Where the sheriff has not continued a term of the Superior Court for the absence of the judge to hold the same, the judge may appear

at any day within the term, and the proceedings thereafter will be valid. Rev., sec. 1510. (If the sheriff had not already adjourned the term under the statute.)

"3. Where the judge of the district is prevented from holding a term of court, as in case of detention by a ·trial in another county extending over into such term, the Governor may designate and appoint another judge to hold such term, or a part thereof, though within the same district, and by virtue of his commission he is a judge both *de facto* and *de jure* while so acting."

No error.