### STATE OF NORTH CAROLINA v. PERRY SANDERS

#### No. 43

(Filed 12 June 1970)

**1. Homicide § 31; Criminal Law § 135— first-degree murder — bifurcated jury trial**

In this State a defendant in a first-degree murder prosecution is not entitled to a bifurcated jury trial with one jury determining the guilt or innocence and the other fixing the punishment. G.S. 14-17.

**2. Jury § 7— charge of racial discrimination — absence of Negroes from jury**

There is no merit to a Negro defendant's charge that members of his race were deliberately excluded from the petit jury which tried him, where the record discloses that (1) nine of the first 53 jurors tendered were Negroes, (2) the trial court in its discretion properly excluded one of the Negro jurors, who was 84 years old, (3) two of the Negro jurors were peremptorily challenged, and (4) the remaining six Negroes were properly excused for cause after each had stated that he was opposed to capital punishment and would not consider the death penalty.

**3. Jury § 7— racial discrimination — burden of proof**

Defendant has the burden of proof of establishing racial discrimination in the composition of the jury.

STATE *v.* SANDERS

**4. Jury § 7— racial discrimination — presumption**

The absence of Negroes from a particular petit jury is insufficient, in and of itself, to raise a presumption of discrimination.

**5. Jury § 7— demand for proportional representation of race**

Defendant does not have the right to demand that his petit jury be composed in whole or in part of persons of his own race or that there be proportional representation, but only that persons of his race not be intentionally excluded from the jury because of race.

**6. Jury § 7— peremptory challenge**

No cause need be stated for a peremptory challenge. G.S. 9-21.

**7. Constitutional Law § 29; Criminal Law § 135; Jury § 7— exclusion of jurors who would never return death penalty**

In a prosecution for the capital crime of first-degree murder, the Constitution of the United States, as interpreted in *Witherspoon v. Illinois*, 391 U.S. 510, is not violated by the exclusion of those jurors who had testified on *voir dire* that they had already made up their minds that they would not return a verdict pursuant to which the defendant might lawfully be executed, whatever the evidence might be.

**8. Criminal Law § 162— objection to evidence — waiver**

Unless an objection is made in ample time as soon as the opponent has the opportunity to learn the evidence is objectionable, the opponent will be held to have waived it.

**9. Criminal Law § 79; Homicide § 15— first-degree murder — admission by conspirators — res gestae — identity of voices**

In a prosecution of defendant for the first-degree murders of two police officers, which murders were committed shortly after defendant and several companions had robbed a filling station attendant, testimony by the attendant that as defendant and a companion left the station he heard one of them say, "Shoot him, shoot him while he's down," and that the other said, "No, he's taken care of," *held* competent against the defendant notwithstanding the attendant was unable to identify the voices, since the statements were made by fellow conspirators in the course of the robbery as part of the *res gestae*.

**10. Conspiracy § 5— competency of evidence of co-conspirator — res gestae**

Where two of more persons combine or associate together for the prosecution of some fraudulent or illegal purpose, any act or declaration made by one of them in furtherance of the common object, and forming a part of the *res gestæ*, may be given in evidence against the other.

**11. Criminal Law § 76— admissibility of confession — waiver of right to counsel — findings**

In a prosecution charging defendant with the first-degree murders of two police officers, defendant's confession to a police officer was properly admitted in evidence, where there was competent evidence on the *voir dire* to support findings by the trial court that defendant had been fully advised of his rights under *Miranda v. Arizona*, 384 U.S. 436, and that de-

fendant freely, voluntarily, and understandingly waived his right to counsel and made his statement voluntarily and with understanding.

**12. Criminal Law § 86— impeachment of defendant — prior offenses — opportunity to explain conviction**

Defendant in a first-degree murder prosecution was not prejudiced by the trial court's refusal to allow him to explain on redirect examination his admission on cross examination that he had been previously convicted of assault·on a female, where the record disclosed that defendant on cross examination had testified to the substance of the excluded testimony.

**13. Criminal Law § 86— impeachment of defendant — opportunity of correction**

A defendant is entitled to full opportunity to correct or explain his answers in response to impeaching questions.

**14. Criminal Law § 167— prejudicial error — new trial**

To warrant a new trial, there should be made to appear that the ruling complained of was material and prejudicial to defendant's rights and that a different result would have likely ensued.

**15. Homicide §§ 18, 21— murder of police officers — premeditation and deliberation — sufficiency of evidence**

In a prosecution charging defendant with the first degree murders of two police officers, which murders were committed shortly after defendant and his companions had robbed two filling stations, there was sufficient evidence of premeditation and deliberation by defendant to be submitted to the jury, where the evidence disclosed that (1) the officers, in the course of investigating the robberies, had stopped the automobile in which defendant and his companions were riding, (2) the officers attempted to arrest one of the companions for carrying a pistol, (3) the defendant then shot the first officer because he "was thinking about what I would have to face," and (4) the defendant continued to fire the cartridges of two pistols into the officers after they had fallen and were helpless.

**16. Homicide § 14— murder of police officers — presumption of malice**

In a prosecution charging defendant with the first-degree murders of two police officers, malice may be presumed from evidence which satisfies the jury beyond a reasonable doubt that the death of the officers proximately resulted from pistol shots intentionally fired at them by defendant.

**17. Homicide § 18— premeditation and deliberation — circumstantial evidence**

The elements of premeditation and deliberation are not usually susceptible to direct proof, but must be established from the circumstances surrounding the homicide.

**18. Homicide § 4— premeditation defined**

Premeditation means "thought beforehand" for some length of time, however short.

**19. Homicide § 4— premeditation and deliberation — length of time**

No fixed amount of time is required for the mental processes of pre-

meditation and deliberation constituting an element of murder in the first degree, it being sufficient if these mental processes occur prior to, and not simultaneously with, the killing.

**20. Criminal Law § 113— instructions — recapitulation of evidence**

The recapitulation of all the evidence is not required under G.S. 1-180, and nothing more is required than a clear instruction which applies the law to the evidence and gives the position taken by the parties as to the essential features of the case.

**21. Homicide § 31; Criminal Law § 135; Constitutional Law § 29— death sentence for first degree murder — effect of Jackson decision**

Notwithstanding the effect, if any, that *U. S. v. Jackson*, 390 U.S. 570 might have had upon the validity of [former] G.S. 15-162.1 which authorized a plea of guilty in a first degree murder prosecution, the *Jackson* decision did not, at the time of the judgment in this first-degree murder prosecution, forbid the courts of this State to impose the sentence of death pursuant to a verdict of the jury in accordance with G.S. 14-17.

BOBBITT, C.J., and SHARP, J., dissenting.

APPEAL by defendant from *Fountain, J.,* at the 17 November 1969 Criminal Session of FORSYTH.

The defendant appeals from judgments sentencing him to death. He was charged in two indictments with murder in the first degree and entered pleas of not guilty to each charge. The two cases were consolidated for trial, and the jury returned a verdict of guilty as charged in each of the indictments, without recommendation that his punishment be imprisonment for life. The indictments, verdicts, and judgments were all proper in form. The crimes were alleged to have occurred in Surry County, but pursuant to an order changing venue, the trial was held in Forsyth County.

The evidence favorable to the State shows the following sequence of events: About 6 p.m. on 3 February 1969 defendant Perry Sanders, his brother Laxie Sanders, Charles Monroe, and James Monroe left Sanford, North Carolina in a 1967 red Dodge convertible belonging to Charles Monroe and headed in the direction of Winston-Salem, with the intention of robbing a service station to obtain money to pay their respective debts. About 10 p.m. they came upon a service station near the airport in Winston-Salem. Charles Monroe parked the car on a side street. The other three men went into the station, and upon determining that the operator, Harvey King, was alone, Perry Sanders pulled his .22 caliber pistol and demanded money. After King surrendered his money and his wallet, he was ordered into the stockroom and told to lie down on the floor. Perry Sanders then struck King with a set of air horns and he appeared to be un-

conscious; however, he was conscious and as soon as the robbers left, King reported the robbery to the Forsyth County Sheriff's Department. The defendant and his companions then drove north toward Rural Hall where they found Wesley Hunsucker's service station open around 10:25 p.m. Perry Sanders and James Monroe went inside, and after determining that Hunsucker was alone, the defendant pulled his pistol on the victim. State's witness Hunsucker testified that Perry Sanders told him to "stand up and take it easy or he would kill [him]." After his wallet had been removed and the cash register emptied, Hunsucker was ordered to get down on the floor and was struck with a bottle by one of the robbers. He was then ordered into the service area of the station and told to get down on his knees. Monroe struck Hunsucker on the head with his pistol, and Hunsucker, pretending to "play dead," crumpled over some tires. As Sanders and Monroe were leaving, Hunsucker heard one of them say, "Shoot him, shoot him while he's down," and the other said, "No, he's taken care of." On their way out, Sanders took a .32 gauge Ivey Johnson single-barrel shotgun from the office of the service station.

According to defendant's own testimony at trial, the following is an account of the incidents leading up to the arrest of defendant on the murder charges: After the robbery of the second service station, defendant and his companions drove north through Rural Hall toward Pilot Mountain. On the Highway #52 Bypass around Pilot Mountain, a marked city police car began following the Monroe vehicle. Monroe pulled his car over when the officers in the patrol car flashed the blue light. Officers Ralph East and Glenn Branscome approached the Monroe car on the driver's side, and one of them asked Charles Monroe for his driver's license. Then one of the officers said they had heard of an armed robbery and wanted to search the car; the four agreed to permit the search and got out of the car. As Perry Sanders stepped out, he slid his .22 caliber pistol under the car. Officer Branscome first searched James Monroe and found a pistol in his belt; he told Monroe that he was going to arrest him for carrying a pistol. As Officer Branscome started to put the handcuffs on James Monroe, defendant picked up his pistol from underneath the car and fired at Branscome. Defendant testified: "I was thinking about what I would have to face, I guess. . . . The first time I just threw my hands up. I just threw the gun up and closed my eyes and fired. I didn't aim, not really. When I fired the shot he just started — he just seemed to draw up and started screaming and I started firing again. . . . I continued to fire the weapon until he stopped screaming." At this point Officer East, who was standing on the driver's side of the Monroe car, began running back to the patrol

car. Defendant testified as follows: "[Officer East] started running and I caught him out of the corner of my eye and he was screaming and I ran up to him and I fired at him once or twice and he fell and he started screaming. . . . I discovered that my own gun was empty. I think I fired at him twice out of my gun and it kept clicking and he was screaming and kicking and I just snatched his [pistol] up and started shooting. I shot him with his weapon because he just kept up this scream. . . . I quit firing after he stopped screaming." Defendant and Charles Monroe retrieved Monroe's driver's license from the shirt pocket of one of the officers, and the four men left, driving first toward Mount Airy on Highway #52 and then along Highway #601 toward Winston-Salem.

About 10:50 p.m. a motorist traveling toward Pilot Mountain on Highway #52 met a red car with one headlight burning. A few minutes later the motorist came upon the officers' patrol car parked on the shoulder of the road with its headlights burning and the blue light flashing. The bodies of Officers East and Branscome were lying within several feet of the patrol car; both had received multiple gunshot wounds in the head and body. The bodies of the two officers were taken to the hospital where a later examination disclosed that Officer Branscome had seven gunshot wounds — two in the head, one in the right shoulder, three in the chest area, and one in the right arm; and Officer East had five gunshot wounds — one in the left shoulder, one in the chest, and three through the head. Death in each case resulted from these gunshot wounds.

Between 12:15 and 12:30 a.m. on 4 February 1969, Winston-Salem Police Officer A. C. Brandon spotted a red convertible with one headlight burning, which matched the description of an automobile described earlier in a police broadcast alert. The officer began following the convertible and radioed for assistance. Police cars soon converged at an intersection, and the suspected car was stopped. The four occupants, Perry Sanders, Laxie Sanders, Charles Monroe, and James Monroe, were ordered out of the car, and each was searched. On a second search, a .22 caliber pistol was found concealed in Perry Sanders' undershorts. A search of the car disclosed over $1,000 in various denominations of currency, a brown wallet containing the identification of Harvey Woodleaf King, a black wallet containing the identification of Wesley Ronald Hunsucker, and a 7.54 caliber automatic pistol. All four men were taken into custody by the Winston-Salem police and arrived at the police station shortly after 12:30 a.m.

About 1 a.m. Detective R. E. Linville, in the presence of S.B.I.

Agent H. T. Hartley and Captain H. C. Carter of the Detective Division of the Winston-Salem Police Department, after fully advising defendant of his constitutional rights, began questioning him. With permission of defendant his statement was recorded on a tape recorder; it was transcribed and later signed by him in the Forsyth County jail about 3:30 p.m. on 4 February 1969 after he had read it and made a correction as to one of the names. The confession, which was introduced in evidence by the State's witness R. E. Linville, was substantially similar to the testimony given by the defendant on the stand, the primary difference being the number of times that defendant shot the first officer. In his confession defendant stated that he first shot Officer Branscome and then chased down Officer East, who was headed for the patrol car, and shot him from behind; he then took East's .38 caliber pistol and shot him several times in the head with it, and "ran back and shot the other one [Branscome] four or five times until [he] finished emptying the gun." However, the defendant testified on the stand that he did not go back and shoot Branscome after he had shot East.

Defendant's only evidence at trial was his own testimony, in which he described the robberies of the two service stations and the shootings of the two police officers, and the testimony of three character witnesses, Sergeant Freeman Worthy of Fort Bragg; Jasper Sanders, the defendant's father; and Mrs. Harriet Johnson, an acquaintance. Sergeant Worthy and Mrs. Johnson testified that defendant's general reputation was good.

The jury returned a verdict of guilty as charged in each indictment of first degree murder, and the death sentence was imposed by the court. From these judgments the defendant appealed.

*Attorney General Robert Morgan and Staff Attorney Donald M. Jacobs for the State.*

*Carroll F. Gardner for defendant appellant.*

MOORE, J.

[1] Defendant's first assignment of error challenges the single-verdict procedure followed by North Carolina in capital cases. He contends he is entitled to a bifurcated jury trial with one jury determining the guilt or innocence and the other fixing the punishment. Our statute, G.S. 14-17, provides:

"A murder which shall be perpetrated by means of poison, lying in wait, imprisonment, starving, torture, or by any other kind of willful, deliberate and premeditated killing, or which

shall be committed in the perpetration or attempt to perpetrate any arson, rape, robbery, burglary or other felony, shall be deemed to be murder in the first degree and shall be punished with death: Provided, if at the time of rendering its verdict in open court, the jury shall so recommend, the punishment shall be imprisonment for life in the State's prison, and the court shall so instruct the jury. All other kinds of murder shall be deemed murder in the second degree, and shall be punished with imprisonment of not less than two nor more than thirty years in the State's prison."

This Court has consistently upheld the single-verdict procedure established by this statute. *State v. Roseboro,* 276 N.C. 185, 171 S.E. 2d 886; *State v. Ruth,* 276 N.C. 36, 170 S.E. 2d 897; *State v. Hill,* 276 N.C. 1, 170 S.E. 2d 885; *State v. Atkinson,* 275 N.C. 288, 167 S.E. 2d 241; *State v. Peele,* 274 N.C. 106, 161 S.E. 2d 568, cert. den. 393 U.S. 1042, 89 S. Ct. 669, 21 L. ed. 2d 590 (1969); *State v. Spence and Williams,* 274 N.C. 536, 164 S.E. 2d 593. And Federal courts hold that this procedure does not violate due process or infringe upon defendant's constitutionally guaranteed right of silence. *Sequra v. Patterson,* 402 F. 2d 249 (10th Cir., 1968); and *Sims v. Eyman,* 405 F. 2d 439 (9th Cir., 1969). In *Spencer v. Texas,* 385 U.S. 554, 87 S. Ct. 648, 17 L. ed. 2d 606 (1967), the Supreme Court of the United States said: "Two-part jury trials are rare in our jurisprudence; they have never been compelled by this Court as a matter of constitutional law, or even as a matter of federal procedure."

Counsel for defendant in his brief very frankly conceded this assignment to be without merit unless the United States Supreme Court should overrule our present practice by its decision in the case of *Maxwell v. Bishop,* 398 F. 2d 138 (8th Cir., 1968), cert. granted December 16, 1968, 393 U.S. 997, 89 S. Ct. 488, 21 L. ed. 2d 462, pending in that Court at the time defendant filed his brief. *Maxwell* involves Arkansas' statutes containing provisions similar to those in our North Carolina statutes. In allowing *certiorari* the Supreme Court of the United States limited considerations to questions 2 and 3 of the petition for *certiorari,* viz:

"2.  Whether Arkansas' practice of permitting the trial jury absolute discretion, uncontrolled by standards or directions of any kind, to impose the death penalty violates the Due Process Clause of the Fourteenth Amendment?

"3.  Whether Arkansas' single-verdict procedure, which requires the jury to determine guilt and punishment simultaneously and a defendant to choose between presenting mitigating

evidence on the punishment issue or maintaining his privilege against self-incrimination on the guilt issue, violates the Fifth and Fourteenth Amendments"?

The United States Supreme Court has now spoken in *Maxwell*, (June 1, 1970) 398 U.S. 262, 90 S. Ct. 1578, 26 L. ed. 2d 221. Without deciding the issues involved, the case was remanded to Federal District Court in Arkansas for a hearing on the exclusion of prospective jurors who had scruples against the death penalty. The same issues raised in *Maxwell* are still pending before the United States Supreme Court in other cases, but we do not think we should anticipate that that Court will declare unconstitutional a practice approved in many states, including our own, for so many years. This assignment is overruled.

**[2-6]** Defendant next assigns as error the overruling of his motion to dismiss the jury for that (1) all Negroes (members of defendant's race) were deliberately excluded, and (2) all jurors who expressed opposition to the death penalty were excused either for cause or peremptorily. The motion sets out that 9 of the first 53 jurors tendered were Negroes, and 6 of these 9 were excused for cause after each had stated he was opposed to capital punishment and would not consider the death penalty. Another was 84 years of age and was excused by the court because of her age, and the two remaining were challenged peremptorily. Defendant had the burden of proof of establishing racial discrimination. *State v. Ross*, 269 N.C. 739, 153 S.E. 2d 469. The absence of Negroes from a particular petit jury is insufficient, in and of itself, to raise a presumption of discrimination. *State v. Brown*, 271 N.C. 250, 156 S.E. 2d 272. Defendant does not have the right to demand that his petit jury be composed in whole or in part of persons of his own race or that there be proportional representation, but only that persons of his race not be intentionally excluded from the jury because of race. *State v. Lowry and State v. Mallory*, 263 N.C. 536, 139 S.E. 2d 870, appeal dismissed and cert. den. in *State v. Mallory*, 382 U.S. 22, 86 S. Ct. 227, 15 L. ed. 2d 16 (1965). The court in its discretion properly excused the juror who was 84 years of age, and the remaining 6 Negroes were properly excused for cause because of their belief concerning capital punishment. No cause need be stated for a peremptory challenge. G.S. 9-21. In the absence of any evidence of racial discrimination, the court correctly overruled this part of defendant's motion.

**[7]** The defendant further alleges that the six Negro prospective jurors, as well as others, were excused for cause contrary to the decision in *Witherspoon v. Illinois*, 391 U.S. 510, 88 S. Ct. 1770, 20 L.

ed. 2d 776 (1968), because they opposed capital punishment. Prior to *Witherspoon*, it was well established that under the law in North Carolina it was not error to allow challenges for cause by the State to prospective jurors who stated they had "conscientious scruples against the death penalty" in a case where such penalty might be inflicted pursuant to a verdict of guilty. *State v. Atkinson, supra; State v. Spence*, 271 N.C. 23, 155 S.E. 2d 802, vacated 392 U.S. 649, 88 S. Ct. 2290, 20 L. ed. 2d 1350 (1968); *State v. Bumpers* (first hearing), 270 N.C. 521, 155 S.E. 2d 173, rev'd 391 U.S. 543, 88 S. Ct. 1788, 20 L. ed. 2d 797 (1968); *State v. Childs*, 269 N.C. 307, 152 S.E. 2d 453. However, in *Witherspoon* the Court said:

> "The issue before us is a narrow one. It does not involve the right of the prosecution to challenge for cause those prospective jurors who state that their reservations about capital punishment would prevent them from making an impartial decision as to the defendant's guilt. Nor does it involve the State's assertion of a right to exclude from the jury in a capital case those who say that they could never vote to impose the death penalty *or that they would refuse even to consider its imposition in the case before them.* For the State of Illinois did not stop there, but authorized the prosecution to exclude as well all who said that they were opposed to capital punishment and all who indicated that they had conscientious scruples against inflicting it.
>
> *    *    *
>
> ". . . Specifically, we hold that a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause *simply* because they voiced *general objections* to the death penalty or expressed *conscientious or religious scruples* against its infliction." (Emphasis added.)

Again, in Footnote 21, the Court said:

> "We repeat, however, that nothing we say today bears upon the power of a State to execute a defendant sentenced to death by a jury from which the only veniremen who were in fact excluded for cause were those who made unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt.*"

The record here discloses no violation of the rule in *Witherspoon*. The trial court was very careful to see that the solicitor, in exam-

ining prospective jurors for the State, adhered strictly to that rule. For example, Ruth E. Williams was excused for cause after he stated:

"I do not believe in capital punishment.

"Q. You don't know of any case in which you might return such a verdict if you were chosen as a juror?

"A. Never.

"Q. You wouldn't do it under any facts or circumstances, no matter how aggravated the case was and no matter what the facts were in the case?

"A. I wouldn't do it. My wife and I discussed it several times before, and I would not do it.

"Q. You've made up your mind about it?

"A. A long time ago."

C. C. Mertes was excused for cause:

"Q. Do you believe in capital punishment?"

"A. I assume you mean the death penalty.

"Q. Yes sir.

"A. No sir.

"Q. You don't feel that in any case, regardless of what the circumstances are or how aggravated the case was, you would give any consideration to returning a verdict that would involve the death penalty?

"A. I do not.

"Q. Have you thought about this before, sir?

"A. Considerably.

"Q. This is not just something that you thought — well, you've thought about this before?

"A. Oh, yes.

"Q. And you are opposed to it?

"A. I'm opposed to it.

"Q. If you were chosen to sit on this jury, are you saying that you would not give any consideration to returning a verdict which would involve the death penalty?

"A. I would not.

"Q. Under no circumstances, regardless of what the facts of the case were?

"A. I would not."

Mrs. Tommy M. Jones was excused for cause after stating:

"I don't believe in capital punishment. I have never sat on the jury before.

"Q. Do you feel that there's any case in which you would consider a verdict involving the death penalty?

"A. No.

"Q. You wouldn't even consider returning such a verdict no matter what kind of case it was or how aggravated it was or what the facts were?

"A. I wouldn't.

"Q. Under no circumstances?

"A. No.

"Q. Have you thought about this before?

"A. Well, all of my life I've thought of it, ever since I've been big enough to know these things."

Similar questions were asked and similar answers were given by the other prospective jurors excused for cause. It is perfectly clear from these answers that each of these prospective jurors, before hearing any of the evidence, had already made up his mind that he would not return a verdict pursuant to which the defendant might lawfully be executed whatever the evidence might be. In the language of the majority opinion in *Witherspoon*, these jurors made it clear that "they could never vote to impose the death penalty" or "they would refuse even to consider its imposition in the case before them" and "they would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them." We conclude, therefore, that there is no merit in defendant's contention that he has been denied any right under the Constitution of the United States or the laws of this State in the sustaining of any challenges for cause by the State by reason of the prospective juror's statement of his views on the subject of capital punishment. *Witherspoon v. Illinois, supra; State v. Roseboro, supra; State v. Ruth, supra; State v. Hill, supra; State v. Atkinson, supra; State v. Peele, supra; State v. Spence and Williams, supra.*

[8-10] Defendant's third assignment of error challenges as hear-

say certain testimony of the witness Hunsucker, the second robbery victim. After Hunsucker had been robbed, defendant and James Monroe ordered him into one of the service bays of the service station and instructed him to get down on his knees; as he did so Monroe struck him with an automatic pistol, and Hunsucker crumpled over on some tires. As defendant and Monroe were leaving, Hunsucker testified he heard one of them say, "Shoot him, shoot him while he's down," and the other one said, "No, he's taken care of." Hunsucker testified he did not know which statement was made by defendant. Defendant did not object, but after Hunsucker testified he did object and moved to strike. His motion was denied. Unless an objection is made in ample time as soon as the opponent has the opportunity to learn the evidence is objectionable, the opponent will be held to have waived it. *State v. Edwards,* 274 N.C. 431, 163 S.E. 2d 767. The Hunsucker testimony revealed from the first that he was unable to identify the spokesman. Hence, defendant should have objected, and his failure to do so constituted a waiver. However, we hold this testimony competent. Defendant and James Monroe were jointly engaged in robbing the service station operated by Hunsucker as part of a conspiracy entered into prior to the robbery. The statements to which Hunsucker testified were made in the course of the robbery as part of the *res gestæ:* "The law undoubtedly is, that where two or more persons combine or associate together for the prosecution of some fraudulent or illegal purpose, any act or declaration made by one of them in furtherance of the common object, and forming a part of the *res gestæ,* may be given in evidence against the other." *State v. Davis,* 177 N.C. 573, 98 S.E. 785. Accord, *State v. Gallimore,* 272 N.C. 528, 158 S.E. 2d 505; *State v. Ross, supra.* Defendant in his brief admits that testimony concerning the two robberies was competent in the trial of the defendant for murder for the purpose of showing the identity of the accused and to properly develop the evidence in the murder cases. *State v. Atkinson, supra; State v. McClain,* 240 N.C. 171, 81 S.E. 2d 364. It follows then that statements made during the course of the robbery, whether by the defendant or his partner in crime, would be competent. This assignment is overruled.

[11]    Defendant next contends his alleged confession was not voluntary because it was the product of coercion through fear, and that he did not knowingly, voluntarily, and intelligently waive his rights and, therefore, the admission of this purported confession was contrary to the decision in *Miranda v. Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. ed. 2d 694, 10 A.L.R. 3d 974 (1966), which lays down the governing principles as to the constitutional prerequisites to the ad-

missibility of statements obtained from an accused during custodial police interrogation. However, after a defendant has been properly advised of his rights as provided for in *Miranda,* he may waive these constitutional rights provided the waiver is made voluntarily, knowingly, and intelligently.

As stated in *State v. Wright,* 274 N.C. 84, 161 S.E. 2d 581, cert. den. 396 U.S. 934, 90 S. Ct. 275, 24 L. ed. 2d 232 (1969):

> " 'The test of admissibility is whether the statement by the defendant was in fact made voluntarily.' *State v. Gray,* 268 N.C. 69, 150 S.E. 2d 1. See also *State v. Rogers,* 233 N.C. 390, 64 S.E. 2d 572; *State v. Gosnell,* 208 N.C. 401, 181 S.E. 323; *State v. Livingston,* 202 N.C. 809, 164 S.E. 337. The admission is rendered incompetent by circumstances indicating coercion or involuntary action. *State v. Guffey,* 261 N.C. 322, 134 S.E. 2d 619. The 'totality of circumstances' under which the statement is made should be considered. *State v. Chamberlain,* 263 N.C. 406, 139 S.E. 2d 620. Mental capacity of the defendant, *State v. Whittemore,* 255 N.C. 583, 122 S.E. 2d 396, whether he is in custody, *State v. Guffey, supra,* the presence or absence of mental coercion without physical torture or threats, *State v. Chamberlain, supra,* are all circumstances to be considered in passing upon the admissibility of a pretrial confession and in passing upon the voluntariness of a waiver of constitutional rights."

In the present case, the court, on motion of the defendant and in the absence of the jury, conducted a *voir dire* as to the voluntariness of the purported statement made by the defendant to the officers. The State offered the testimony of R. E. Linville, the detective who interrogated the defendant, and Officers Beane and Carter. The defendant testified in his own behalf. The defendant's evidence tended to show that he was scared because so many officers were present, and that before he was questioned he heard officers outside the room in which he was sitting make the statements, "We got a black boy we are fixing to lynch," and "Let us have him and take him and let him have an accident with a blackjack"; and that Officer Linville said, "If you want to make it easy on yourself and everybody else, just tell us anything you want to tell us." Defendant further said that he did not understand what Officer Linville tried to tell him about his rights and that Officer Linville did not tell him that he was entitled to a lawyer. The officers present denied that any threats were made inside or outside the room in which the defendant was located, and Officer Linville denied that he made the statement attributed to him by the defendant. Officer Linville's testimony as to

what he told defendant concerning his right to make or not make any statement and his right to have a lawyer present is correctly set out in the judge's findings of fact. Officer Carter testified that he told defendant that he was in serious trouble and "that he needed a good attorney" and that "he needed one then." After hearing the evidence the court found:

"That the defendant was detained in the Community Services Room of the second floor of City Hall in Winston-Salem, and that room adjoins a room with the office of Detective Linville; that he was kept there approximately thirty minutes in the custody of two police officers, neither of whom questioned him or talked to him during that period of time. The court further finds as a fact that at no time while the defendant was in custody did any officer or anyone else make any threat to him of any kind, nature or description, nor did any officer make any statement which was overheard by the defendant and which could constitute or be construed to constitute any threat of any nature or description.

"The court further finds as a fact that Detective Linville talked to the defendant shortly after one a.m. February 4th, 1969, which was not more than forty-five minutes from the time of the defendant's apprehension on the corner of Stratford Road and Country Club Drive and Miller Street; that before asking the defendant any questions relating to the charges against the defendant, Officer Linville did, on February the 4th, 1969, at 1:05 a.m. read to the defendant the following in quotations:

" 'Your rights. Before we ask you any questions, you must understand your rights. You have the right to remain silent. Anything you say can be used against you in court. You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning. If you cannot afford a lawyer, one will be appointed for you by the court, before any questioning if you wish. If you decide to answer questions, now without a lawyer present, you will still have the right to stop answering at any time until you talk to a lawyer.'

"The defendant thereupon signed a statement appearing on the same page, reading as follows:

" 'Waiver of rights: I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am do-

ing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me by anyone.'

"That was signed by the defendant at 1:10 a.m. on February 4th, 1969. The court further finds as a fact that the defendant thereafter made a statement to Officer Linville and agreed that it may be recorded on a tape recorder to be transcribed later. The defendant thereupon freely, voluntarily, knowingly and understandingly, without any hope of reward or promise of reward, and without any duress or fear made a statement to Officer Linville. Before making the statement and while the waiver of rights was being read to him, Mr. Henry C. Carter, the chief of the detectives for the Winston-Salem Police Department, who was present at the time, told the defendant that it was his — the officer's — opinion that he needed an attorney, and a good attorney, and that he needed one then, because he was in serious trouble. The defendant replied that he knew he was in serious trouble but made no request for an attorney. On the afternoon of February the 4th, 1969, between the hours of three-thirty and six p.m., Officer Linville took the statement which had been transcribed to the county jail to the defendant and with the defendant read the statement in question and answer form as it was made, and transcribed from the tape recorder. The defendant made one correction of another person's name appearing on the statement, stated that the rest of it was correct and initialed each page except the last page which he signed. The court further finds as a fact that the defendant graduated from high school in Sanford, North Carolina, when he was eighteen years of age; that he was in February, 1969, twenty-two years of age; that before signing the waiver of rights, it was not only read to him along with a statement of his rights, but he followed it on another copy of the same document, reading it to himself as it was read to him. The defendant had a full understanding of his right to a lawyer and his right not to answer any questions, and of all other constitutional rights relating to the making of the statement to police officers. The defendant was relatively calm when he talked to the police officers in view of the gravity of the charges against him. He was informed before any questions were asked him, that he would be questioned about two armed robberies and the shooting or assault upon two police officers in Surry County; that he fully understood the purpose of the questions that were asked him, the seriousness of the accusation, and all rights which were afforded him. Upon the fore-

going findings, the court is of the opinion, and so finds that the defendant knew each of the rights and understood each of the rights set out on the document, State's Exhibit A; that he was offered no hope of reward, offered no reward and had no hope of reward. He was under no coercion or fear and that he voluntarily, knowingly, understandingly made statements to Officer Linville. Upon such Findings the objection to the evidence offered by the State is overruled, and the defendant excepts."

There is competent evidence to support the findings that defendant had been fully advised of his rights and that defendant freely, voluntarily, and understandingly waived his rights to counsel and made his statement voluntarily and with understanding. Such findings of fact by the trial judge are conclusive, and the statement made by defendant was properly admitted. *State v. Wright, supra; State v. Gray,* 268 N.C. 69, 150 S.E. 2d 1, cert. den. 386 U.S. 911, 87 S. Ct. 860, 17 L. ed. 2d 784 (1967). This assignment is overruled.

**[12]** Defendant next assigns as error the court's refusal to allow defendant to explain an admission made on cross-examination concerning a prior conviction. On cross-examination defendant testified: "I was convicted of simple assault in the Superior Court on a female. The charge was in Superior Court because it was bound over from a little court where they had a hearing, you know, and they bound it over. She took out a warrant and the warrant read assault with intent to commit rape and I was convicted of assault on a female. I was put on probation and am on probation now." On redirect examination defendant was asked to explain the assault charge. The State objected and the objection was sustained. Defendant excepted and for the record testified: "It stemmed from a charge of assault with intent to commit rape and whenever we went to little Court, the girl — she told lies, and whenever we got to the big Court, she told the truth, and the Judge charged me with assault on a female. I wasn't guilty of that but I just didn't say anything about it. I accepted that because he suspended the sentence."

**[12-14]** Defendant was entitled to full opportunity to correct or explain his answers in response to the impeaching questions. *State v. King,* 225 N.C. 236, 34 S.E. 2d 3; *State v. Oxendine,* 224 N.C. 825, 32 S.E. 2d 648; *Keller v. Furniture Co.,* 199 N.C. 413, 154 S.E. 674; Stansbury, N. C. Evidence § 36 (3d ed. 1963). But it appears here that defendant had already testified to the substance of the excluded testimony. The fact that the prosecuting witness told lies in the "little court" but told the truth in the "big court" resulting in the conviction of defendant for an assault on a female, and the fact that

he was not guilty but did not say anything about it because sentence was suspended, neither added to nor subtracted from, in any substantial manner, the testimony which defendant had already given that he was charged with assault on a female with intent to commit rape but only convicted of simple assault on a female and put on probation. We perceive no harmful or prejudicial result to defendant's cause on this account. *State v. Elder,* 217 N.C. 111, 6 S.E. 2d 840. To warrant a new trial there should be made to appear that the ruling complained of was material and prejudicial to defendant's rights and that a different result would have likely ensued. *State v. Paige,* 272 N.C. 417, 158 S.E. 2d 522; *State v. Woolard,* 260 N.C. 133, 132 S.E. 2d 364; *Collins v. Lamb,* 215 N.C. 719, 2 S.E. 2d 863; *State v. Beal,* 199 N.C. 278, 154 S.E. 604; *State v. Stancill,* 178 N.C. 683, 100 S.E. 241. In view of the serious nature of the facts in this case, we do not think this ruling affected the result. This assignment is overruled.

**[15-19]** Defendant next contends that the court erred in overruling his motion for judgment as of nonsuit on the charge of murder in the first degree for the reason that the evidence of premeditation and deliberation was not sufficient to submit to the jury. To sustain verdicts of murder in the first degree in this case, the evidence must be sufficient to support a finding beyond a reasonable doubt that the defendant with malice, after premeditation and deliberation, intentionally shot and killed the two officers. Malice may be presumed from evidence which satisfies the jury beyond a reasonable doubt that the death of the two officers proximately resulted from pistol shots intentionally fired at them by the defendant. *State v. Propst,* 274 N.C. 62, 161 S.E. 2d 560; *State v. Payne,* 213 N.C. 719, 197 S.E. 573. The additional elements of premeditation and deliberation are not usually susceptible to direct proof, but must be established from the circumstances surrounding the homicide. *State v. Walters,* 275 N.C. 615, 170 S.E. 2d 484; *State v. Faust,* 254 N.C. 101, 118 S.E. 2d 769, 96 A.L.R. 2d 1422, cert. den. 368 U.S. 851, 82 S. Ct. 85, 7 L. ed. 2d 49 (1961). Premeditation means "thought beforehand" for some length of time, however short. *State v. McClure,* 166 N.C. 321, 81 S.E. 458. This Court said in *State v. Benson,* 183 N.C. 795, 111 S.E. 869: "Deliberation means . . . an intention to kill, executed by the defendant in a cool state of blood, in furtherance of a fixed design . . . or to accomplish some unlawful purpose, and not under the influence of a violent passion, suddenly aroused by some lawful or just cause or legal provocation." *State v. Perry,* 276 N.C. 339, 172 S.E. 2d 541; *State v. Faust, supra; State v. Bowser,* 214 N.C. 249, 199 S.E. 31; 4 Strong's N. C. Index 2d, Homicide § 4. No

fixed amount of time is required for the mental processes of premedi-
tation and deliberation constituting an element of the offense of
murder in the first degree, it being sufficient if these mental processes
occur prior to, and not simultaneously with, the killing. *State v.
Walters, supra; State v. Brown,* 218 N.C. 415, 11 S.E. 2d 321; *State
v. Steele,* 190 N.C. 506, 130 S.E. 308; 4 Strong's N. C. Index 2d,
Homicide § 4.

[15]    The evidence of this tragic occasion, which comes either
from defendant's statement to the officers or from his testimony at
trial, is clearly sufficient to permit the jury to make a legitimate in-
ference of premeditation and deliberation. This evidence discloses
defendant shot and killed two officers of the law who were doing what
their duty required — investigating two armed robberies committed
a short time before by defendant and his companions. When the of-
ficers stopped the car, one of them asked Charles Monroe, the driver,
for his driver's license, which Charles gave to him. The policemen
told the occupants that there had been an armed robbery, and they
would like to search the car. The occupants gave their permission
and as they got out, the defendant slipped his pistol under the edge
of the car. When Officer Branscome searched James Monroe and
found a pistol under his belt, he told James he would have to take
him in. As this officer started to handcuff James, defendant reached
down, got his pistol, and shot Officer Branscome. The officer screamed
and defendant continued shooting him until he stopped screaming.
Defendant then saw Officer East running toward the patrol car, and
defendant ran behind him and fired until all the bullets were out of
his pistol; Officer East was screaming, so he took Officer East's pistol
and shot him in the head until he stopped screaming. In his state-
ment to the officers, defendant said he shot both officers in the head
with Officer East's pistol after he had emptied his own pistol. When
asked why he shot the first officer, defendant answered: "I picked up
my weapon whenever he started to put the handcuffs on James. I
don't, I really don't know why I picked it up. So many things I was
thinking — so many things at one time. *I was thinking about what
I would have to face, I guess.*" (Emphasis added.) After defendant
had emptied both pistols — his, which held nine cartridges, and the
one belonging to Officer East, which held six — into the two officers,
defendant was still cool enough to ask Charles as they started to
leave the scene if he had his driver's license. When Charles said
"No," defendant and Charles rolled Officer Branscome over and took
Charles' license out of the officer's shirt pocket. Defendant said the
officer was bleeding at that time, but he did not know whether he
was dead or not. The want of provocation, the absence of any excuse

or justification for the shooting, the number of shots fired, the further shooting of each officer after he was down and apparently helpless, and defendant's statement that he shot the first officer because *he thought of what was facing him,* all permit a reasonable inference that defendant decided to kill the officers rather than be arrested and permit a legitimate inference of premeditation and deliberation. This evidence was sufficient to go to the jury and be considered by it on the issue of murder in the first degree. *State v. Perry, supra; State v. Faust, supra; State v. Lamm,* 232 N.C. 402, 61 S.E. 2d 188.

[20]  Next the defendant contends the trial judge failed to properly state the evidence and array the contentions of the parties in his charge. The recapitulation of all the evidence is not required under G.S. 1-180, and nothing more is required than a clear instruction which applies the law to the evidence and gives the position taken by the parties as to the essential features of the case. *State v. Thompson,* 257 N.C. 452, 126 S.E. 2d 58. If defendant desired fuller instructions as to the evidence or contentions, he should have so requested. His failure to do so now precludes him from assigning this as error. *State v. Butler,* 269 N.C. 733, 153 S.E. 2d 477; *State v. Ford,* 266 N.C. 743, 147 S.E. 2d 198; *State v. Saunders,* 245 N.C. 338, 95 S.E. 2d 876, 3 Strong's N. C. Index 2d, Criminal Law § 163. However, a careful examination of the charge as a whole leads us to the conclusion that the court fully instructed the jury as to the evidence and the contentions of the parties and defined the law applicable thereto. We find no merit in defendant's exceptions to the charge. *State v. McLean,* 234 N.C. 283, 67 S.E. 2d 75; *State v. Hall,* 267 N.C. 90, 147 S.E. 2d 548; *State v. Hairston,* 222 N.C. 455, 23 S.E. 2d 885.

Defendant's last assignment of error relates to the court's pronouncing the judgments of death upon the verdicts. The defendant contends the death sentences authorized by G.S. 14-17 are unconstitutional under the decision in *United States v. Jackson,* 390 U.S. 570, 88 S. Ct. 1209, 20 L. ed. 2d 138 (1968). The shooting of the two officers occurred on 3 February 1969. G.S. 15-162.1 was in effect on that date but was repealed effective 25 March 1969 prior to defendant's trial in November, 1969. Defendant contends that the death penalty provision of G.S. 14-17 was invalid in the month of February, 1969, when the crimes were committed, and was also invalid in the month of November, 1969, when defendant was tried, convicted, and sentenced.

G.S. 15-162.1 provided that any person charged in the bill of indictment with murder in the first degree might after arraignment tender in writing, signed by himself and his counsel, a plea of guilty

of such crime, and the State, with the approval of the court, might accept such plea or reject it, in which latter event the trial should proceed upon a plea of not guilty, and the tender of the plea of guilty would have no legal significance. If the plea was accepted, this would be tantamount to a jury verdict of guilty of the crime charged with recommendation by the jury that punishment be life imprisonment.

In *United States v. Jackson, supra,* the Court considered the Federal Kidnapping Act, 18 U.S.C. 1201, and observed in its opinion that the Kidnapping Act as originally enacted by Congress in 1932 contained no provision for the infliction of capital punishment. An amendment enacted in 1934 inserted the provision authorizing the death penalty to be imposed under specific circumstances "if the verdict of the jury shall so recommend." The decision of the *Jackson* case was that the amendment of 1934 was unconstitutional for the reason that it imposed an impermissible burden upon the exercise of the defendant's constitutional right to demand a jury trial. Prior to the adoption of the 1934 amendment, one accused of violating the Federal Kidnapping Act could exercise his constitutional right to demand a jury trial without risk of the death penalty if the jury found him guilty. Under the 1934 amendment, he could not. For this reason, the Court held the 1934 amendment authorizing the jury to fix the penalty at death was unconstitutional, not because the death penalty *per se* is unconstitutional but because the 1934 amendment discouraged the exercise of the defendant's constitutional right to a trial by jury. The Court then held that the original Federal Kidnapping Act could and should stand as a separate, divisible statutory enactment apart from the 1934 amendment.

**[21]**    Our Court has considered the effect of *Jackson* on G.S. 14-17 and G.S. 15-162.1 and has held that if G.S. 15-162.1 should be held invalid upon the grounds suggested in *United States v. Jackson, supra,* or otherwise, such decision will not and cannot affect the validity of G.S. 14-17, a wholly separate, independent, previously existing and surviving statute. Thus, the decision in *United States v. Jackson, supra,* did not at the time of the judgment in this case, and does not now, forbid the courts of this State to impose the sentence of death pursuant to a verdict of the jury in accordance with G.S. 14-17. *State v. Hill, supra* (276 N.C. 1, 170 S.E. 2d 885); *State v. Atkinson, supra* (275 N.C. 288, 167 S.E. 2d 241); *State v. Spence and Williams, supra* (274 N.C. 536, 164 S.E. 2d 593); *State v. Peele, supra* (274 N.C. 106, 161 S.E. 2d 568, cert. den. 393 U.S. 1042, 89 S. Ct. 669, 21 L. ed. 2d 590 (1969)).

Defendant did not offer to plead guilty under the provisions of

G.S. 15-162.1 which was in effect on the date of the commission of the alleged murders; hence, we are not called upon to decide what effect such a plea would have had. See *Parker v. North Carolina*, 38 U.S.L.W. 4371 (U.S. May 4, 1970); *Brady v. United States*, 38 U.S.L.W. 4366 (U.S. May 4, 1970). He was tried on a plea of not guilty to two charges of murder in the first degree under G.S. 14-17, after the repeal of G.S. 15-162.1. The jury has, upon the evidence offered, under full and correct instructions of the trial judge, found him guilty as charged, without recommendation of life imprisonment. The statute of this State authorized the jury to return such verdicts and required the judge, thereupon, to enter the judgments contained in the record. For, as was said by Higgins, J., in *State v. Hill, supra*, "the repeal of G.S. 15-162.1 did not modify, change, add to, or take from G.S. 14-17, under which the indictment here involved was drawn. The verdict of the jury as returned without a recommendation that the punishment be imprisonment for life required the court to impose the death sentence." This assignment of error is overruled.

We conclude that the evidence introduced at this trial permitted and will support findings that the defendant with malice, premeditation and deliberation, without just cause or excuse, shot and killed Officer Glenn Branscome and Officer Ralph East, who were engaged in the performance of their duty. In fact, this evidence almost compels such findings and amply sustains the verdicts.

After a careful consideration of the defendant's assignments of error, we find no error of law in the trial which would justify us in granting defendant a new trial or in vacating or modifying the judgments.

No error.                                                   -

BOBBITT, C.J., and SHARP, J., dissenting as to death sentence.

We vote to vacate the judgment imposing the death sentence. In our opinion, the verdict of guilty of murder in the first degree should be upheld and the cause remanded for pronouncement of a judgment imposing a sentence of life imprisonment.

The crime was committed on February 3, 1969, when our statutes relating to capital punishment for murder in the first degree were G.S. 14-17 and G.S. 15-162.1. It was and is our opinion that, until the repeal of G.S. 15-162.1 on March 25, 1969, the decisions of the Supreme Court of the United States in *United States v. Jackson*, 390 U.S. 570, 20 L. ed. 2d 138, 88 S. Ct. 1209 (1968), and in *Pope v. United States*, 392 U.S. 651, 20 L. ed. 2d 1317, 88 S. Ct. 2145 (1968),

rendered invalid the death penalty provisions of G.S. 14-17. The reasons underlying our opinion have been stated fully in the dissenting opinions in *State v. Spence,* 274 N.C. 536, 164 S.E. 2d 593, and in *State v. Atkinson,* 275 N.C. 288, 167 S.E. 2d 241, and in *State v. Hill,* 276 N.C. 1, 170 S.E. 2d 885 (1969). See also our dissenting opinion in *State v. Roseboro,* 276 N.C. 185, 171 S.E. 2d 886. In view of the basis on which the Court's opinion undertakes to distinguish the provisions of the Federal Kidnapping Act from the provisions' of G.S. 14-17 and G.S. 15-162.1, reference is made to the dissenting opinion in *State v. Atkinson, supra,* for a discussion in detail of the provisions of the Federal Kidnapping Act considered in *United States v. Jackson, supra,* and of the Federal Bank Robbery Act considered in *Pope v. United States, supra.* Repetition is unnecessary.

G.S. 15-162.1 was repealed by Chapter 117, Session Laws of 1969. The 1969 Act, if construed to provide greater punishment for murder in the first degree than the punishment provided therefor when the crime was committed, would, in that respect, be unconstitutional as *ex post facto.* 16 Am. Jur. 2d Constitutional Law § 396. In our view, if the death penalty provisions of G.S. 14-17 were invalid on February 3, 1969, when the crime was committed, they were invalid as to this defendant in November, 1969, when he was tried, convicted and sentenced.